STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. FORD HIPPLEWITH, DEFENDANT-APPELLANT.

Argued September 12, 13, 1960—Decided October 10, 1960.

302

*Mr. James P. Dugan* argued the cause for the defendant-appellant (*Mr. Richard M. Glassner,* attorney; *Mr. James Dorment, Jr.,* on the brief).

*Mr. Brendan T. Byrne,* Essex County Prosecutor, argued the cause for the plaintiff-respondent (*Mr. Martin L. Greenberg,* on the brief).

The opinion of the court was delivered by

PROCTOR, J. Defendant Ford Hipplewith seeks reversal of a first degree murder conviction with recommendation of life imprisonment on the grounds that remarks of the prosecutor in his opening and summation and instructions of the trial court were so improper and prejudicial as to warrant a finding of plain error.

Defendant admits that he stabbed and killed one Franklin Callis but contends that the killing was in self-defense and to prevent Callis from perpetrating a robbery. According to defendant's signed statement made to the police the day after the homicide and admitted in evidence without objection, the following occurred:

On May 11, 1959, the day before the killing, defendant attended the Rialto Theater in Newark. He fell asleep in the balcony, and when he awakened, found that $12 had been taken from his left trouser pocket. His plastic cigarette case and papers from his wallet were lying on the floor, and his wallet was lying on the back of his seat. He complained to the doorman and the theater maintenance man and was informed that they could do nothing for him.

On May 12, 1959 defendant arose at 8:00 A. M., drank a half pint of wine, and about 12:30 P. M. decided to attend the Rialto Theater, where the program had changed since the previous day. Before leaving the house, he took a butcher knife from the kitchen sink and put it in his belt under his jacket. His explanation for the taking of the knife was that it was on an "impulse." After entering the theater, defendant took a seat in the third row of the balcony on the

left side facing the screen, a different location from the one occupied the previous day. There were no other persons sitting in his row. He had 25¢ in his right trouser pocket, and a pack of cigarettes in a plastic cigarette case and his wallet in his left trouser pocket.

After watching one picture he dozed off. He felt "something annoying" near his left trouser pocket. He shifted his position and dozed off again. Shortly thereafter, he felt a hand inside his left trouser pocket and seized it about the wrist. He remembered he had a knife with him and took it out. Callis (owner of the intruder hand and subsequent deceased) pulled his hand away. The defendant told him, "You robbed me yesterday and you are not going to get away with it today." His statement continues:

"Then I started to get up and he started to move away from me and then I swung twice at him with the knife and I am not sure if I hit him with the knife at that time. Then he ran out from the seats where we were at and he ran into the lobby and when he ran I ran out behind him but I couldnt find him and then somebody said a man fell down on the other side of the lobby and then I walked over to where the man was laying and I saw that he was bleeding and then I told him to get up because he robbed me and he didnt answer and he didnt get up and then I turned around and I walked out of the movies and I put the knife in my belt * * *."

He was arrested while walking on a nearby street. At the police station he identified his plastic cigarette case, which he did not have on him when arrested.

Persons present in the theater testified for the State that they saw the defendant chasing Callis out of the balcony into the lobby. One witness heard a scream coming from the left side of the balcony, followed by a voice (later identified as defendant's) exclaiming: "I'll kill you, you son of a bitch." He testified that he saw the defendant chase Callis out of the balcony into the lobby, and that after Callis fell in the aisle leading back into the interior of the theater the defendant walked over to Callis, took hold of him while he

was lying face down, and dragged him a short distance exclaiming, "You son of a bitch. Come on. Do that again. Do that again. Come on, you son of a bitch. I kill you. I kill you."

Another witness testified that he heard a commotion in the third row of the balcony and someone said: "You —— ——, you done this to me before and got away with it but you are not getting away with it again."

Ernest Rumph, an usher, testified that he saw Callis emerge from the balcony holding his chest and run across the lobby into an aisle leading into the theater proper. He then saw the defendant coming into the lobby from the balcony with a knife in his hand. The latter asked him, "Where did he go?" Rumph asked, "Who?" Defendant replied, "You one of them?" The defendant then went to the entrance door and looked into the street. The defendant then heard someone mention that a man was lying in an aisle in the theater. He crossed the lobby and went into that aisle, took hold of Callis, who was lying face down and pulled him by the back of the coat for about two yards. Rumph further testified that "it seemed like he [defendant] was in the motion of stabbing him [Callis] * * *. Maybe about two times." Rumph did not at anytime see the defendant stab the deceased.

Fred Ruff, the theater maintenance man, corroborated the other witnesses as to the events occurring in the balcony. He added that the defendant held Callis' right arm and that while Callis was struggling to get away, the defendant appeared to be punching him. After the two ran out of the balcony the witness saw the defendant re-enter the lobby from outside, carrying a knife in his right hand. The defendant, after questioning Rumph, the usher, pointed the knife at Ruff, and asked him, "Are you one of them too?" Ruff told the defendant that the whole theater was in an uproar and to put the knife away and get out. The defendant then heard someone say that Callis was lying in the aisle bleeding, and ran across the lobby into the aisle. Ruff

further testified that a cigarette case and gray hat were found on the floor of the theater proper.

Robert Cantwell, a police officer who had participated in defendant's arrest, testified that at police headquarters he asked defendant why the cutting occurred. The defendant replied that "he was asleep in the theater, the Rialto Theater, and that he was awakened by what he thought was a hand in his left hand pocket. He said that when he woke up he stabbed at the person twice."

According to Dr. Edwin H. Albano, Chief Medical Examiner for Essex County, Callis' death was caused by a stab wound, $4\frac{3}{4}''$ in depth on "the left side of the chest perforating the diaphragm producing massive hemothorax; that's hemorrhage in the left chest cavity and hemoperitoneum, internal bleeding in the abdominal cavity." The fatal wound was so located that the deceased "would have to be facing the assailant." There were four other superficial wounds: One on the right side of the chest; one on the middle finger of the left hand; one below the left side of the chin; and one in the back of the left shoulder. There was also a bruise on the left side of the forehead and two abrasions, one on the left knee and one below the right knee. Dr. Albano characterized the wound on decedent's middle finger of the left hand as a "defense cutting wound * * *. A wound that is sustained by an individual while trying to defend himself." He also testified that he found an open pen knife in the left lower pocket of Callis' jacket, and that the wound on Callis' middle finger of his left hand could have been sustained while putting his hand in the pocket containing the pen knife.

The defense relied primarily upon the testimony of defendant at the trial. Hipplewith repeated the circumstances of the theft on May 11, 1959. He testified that on the following morning, he arose at about 5:45 A. M. and went out to "shape up" for construction work. Since he was not selected for employment that day, he returned home, and lay on his bed listening to the radio and drank a half pint of

wine. At 8:00 A. M. he arose, performed household chores, and talked with his mother until about 12:30 P. M. He then decided to return to the Rialto Theater, where the program had changed since the previous day. Before leaving the house he took with him a knife for protection.

The defendant's theater seat was at the extreme right of a row, abutting a metal railing. The only free avenue of egress was to his left. There was no one sitting in the row when he took his seat. He watched one of the pictures through to its conclusion. When the next one came on, he became drowsy and started dozing. He felt a brushing sensation near his left hip, glanced around, saw nothing, shifted his position, and went back to sleep. Later, he felt something inside his left trouser pocket and upon reaching down discovered it was a hand. He became "scared" and grabbed the hand by the wrist. He started to rise from his seat and the intruder did likewise. The defendant testified that he saw the intruder reach into his own left hand pocket with his free left hand. This motion further frightened the defendant, who did not know what Callis might have in his pocket. Defendant released Callis' right hand. Callis did not try to leave the row but remained crouching beside defendant, and raised his right arm to a horizontal position. The defendant thought Callis intended to hurt him. While Callis' left hand was still in his jacket pocket, the defendant drew his knife and swung it twice at Callis. Callis pushed the defendant down into his seat and ran out the row and down the balcony steps. Defendant called after him, "You robbed me yesterday but you ain't going to get away with it today," and followed Callis.

The ensuing events are the same as those portrayed by the State except that the defendant testified that when he came upon the body of Callis lying face down in the passageway leading into the theater proper, he reached down, turned Callis over, saw he was bleeding, made no effort to stab him again and left the theater. Later, defendant discovered that his cigarette case was missing from his left trouser pocket.

He next saw it when he was being interrogated at police headquarters the following day when it fell out of a pile of Callis' clothing.

With the exception of a character witness and two witnesses who were not present at the theater and whose testimony was insignificant, this concluded the defendant's case.

## I.

Defendant urges as his first general ground for reversal that the prosecutor in his opening and summation made improper and prejudicial remarks which deprived defendant of a fair trial. Defense counsel did not interpose objections to these remarks. Therefore, to warrant a reversal such remarks must constitute plain error—that is, they must so grievously affect the substantial rights of the defendant as to convince us that they possessed a clear capacity to bring about an unjust result. *State v. Corby,* 28 *N. J.* 106, at *p.* 108 (1958); *R. R.* 1:5-1(a).

## (A).

In his opening, the prosecutor stated that the defendant formulated the intent to kill the day before the homicide. The defendant argues that this assertion constituted plain error because it was not subsequently supported by the evidence and the prosecutor knew or should have known that it could not be so supported. A prosecutor may state in his opening only facts he intends in good faith to prove by competent evidence. *State v. Haines,* 103 *N. J. L.* 534 *(Sup. Ct.* 1927). Proof often fails to meet expectations. But such failure is not ground for reversal unless allegations in the opening statement are completely unsupported by the evidence and there is a showing of prejudice to the defendant and bad faith by the prosecutor. *Annotation* 28 *A. L. R.* 2d 972 (1953). In the present case, evidence was introduced which supports the challenged remark and which therefore negates prejudice to the defendant and bad faith by the

prosecutor. In his statement made to the police on May 13, 1959, the defendant said that he had been victimized on May 11 at the theater; that he had complained to the management and received no satisfaction; that on May 12 he arose at 8:00 A. M. (rather than his accustomed hour of 6:00 A. M. when he usually reported for the daily shape up) ; that before leaving for the theater on May 12, he took a butcher knife with him; and that when confronted by Callis in the theater on May 12 he said, "You robbed me yesterday, and you are not going to get away with it today." From the above facts, a jury could reasonably conclude that the defendant was furious about his victimization on May 11, returned home, brooded about it, and determined to locate and execute the thief on the following day. Moreover, from the evidence a jury could at least reasonably conclude that the defendant formed the intent to kill at some time before his meeting with Callis in the theater. Since it is sufficient to sustain a conviction of first degree murder (assuming premeditation and deliberation) that defendant formulated an intent to kill at any time prior to the act of killing, we fail to see how he could be prejudiced by the State's assertions that he formulated the intent on May 11.

## (B).

Defendant also urges reversal on the ground that the prosecutor in his summation improperly stated his personal belief in the guilt of defendant and insinuated that such belief was based on facts not before the jury. The prosecutor said:

"If ever there is a breakdown in any part of our overall law enforcing agencies then our society then becomes an anarchy. You are as important as the police officers, the Judge, the prosecutor, and everyone else connected with this, and we all, we all have a duty to perform and we have to perform it with a definite idea that we are a part of our overall society. If either one of us fail then our society is no longer a society that says it will protect all citizens. These are the things that we have to think about. These are the things that although this trial has lasted five days, *I have*

*been living with it much longer than five days,* this particular trial, and *in doing so, in living with it and thinking about the* factual situation, it puts pressure on all of us to determine whether or not we have the facts and the evidence. After they are added up do they add up to a guilty verdict against this defendant?

Now, my function here after having presented this matter to the Court and jury on behalf of the state is to sum up what I think is relevant. *I can sum up in this case with a lot of convictions that this man is guilty. I think in getting this case before this jury the investigation that has gone on prior to our appearance in Court, when we go over the sum total of everything, I am convinced that this man is guilty and I feel that at the close of this case there is only one verdict that this jury can return and that verdict also will indicate the guilt of this defendant."* (Italics added)

■■ It is improper for a prosecutor to state in general or abstract terms his personal belief in the guilt of a defendant. Canon 15 of the Canons of Professional Ethics, *R. R.* 1:25. But a prosecutor's expression of belief in a defendant's guilt is not necessarily reversible error if he states that it is based solely on facts adduced at the trial. *State v. Butler,* 27 *N. J.* 560, 606 (1958) ; *Annotation* 50 *A. L. R.* 2d 766, 775 *n.* 10 (1956) ; *Cf. State v. Barker,* 68 *N. J. L.* 19 *(Sup. Ct.* 1902). And *a fortiori* such expression of belief, when based on facts in evidence, does not constitute plain error. *State v. Pisano,* 33 *N. J. Super.* 559 *(App. Div.* 1955) certification denied 19 *N. J.* 385 (1955). Where, however, the prosecutor insinuates that his belief is based on facts not presented to the jury or that he is bringing to bear some expertise based on his experience or position, his expression of opinion may constitute reversible error, *Aponte v. State,* 30 *N. J.* 441 (1959) ; *Annotation, supra,* 50 *A. L. R. 2d,* at *p.* 773 *nn.* 19, 20; or plain error, *State v. Ferrell,* 29 *N. J. Super.* 183 *(App. Div.* 1954) ; *Annotation, supra,* at *p.* 800 *n.* 4. The vice inherent in such insinuation is that it encourages the jury to base its decision on the undisclosed, superior knowledge of the prosecutor, who, in their eyes, represents the authority of the government and the people of the State. See *Berger v. United States,* 295 *U. S.* 78, 55 *S. Ct.* 629, 79 *L. Ed.* 1314 (1935) ; *State v. Johnson,* 31 *N. J.* 489, at *p.* 511 (1960). Additionally, the

defense is deprived of the opportunity to cross-examine what is in effect unsworn and probably inadmissible testimony. *Note,* 54 *Colum. L. Rev.* 946, 955 (1954).

█ In the above-quoted portion of the prosecutor's summation, he implied that as a result of his living with the case and the investigation performed prior to trial, he had knowledge of facts not before the jury which convinced him of the defendant's guilt. We have on numerous occasions expressed our strong disapproval of such improper excursions outside the evidence, see *e. g. State v. Bogen,* 13 *N. J.* 137 (1953) ; *State v. Johnson, supra,* but we do not believe that the prosecutor's remarks in the present case constitute grounds for reversal. An examination of the remarks in the context of the complete summation indicates that they could not have misled the jury. Following the challenged remarks, the prosecutor said :

"* * * he [defendant] is entitled to all the deliberations and interest and attention to this case that this jury can give it. He is also entitled to all the evidence that the State can adduce both in his behalf and also in behalf of the State. The State has attempted in this matter to prove his guilt and the State has produced every known bit of evidence they have at their command to show that this man is guilty as charged and I submit to you that the only verdict that could be rendered in this case is that Mr. Hipplewith is guilty of the murder of Mr. Callis."

Here, the prosecutor clearly announced that the State had produced all the evidence it had. It is therefore most unlikely that the jury believed the prosecutor's opinion was based on his unrevealed, superior knowledge of facts in the case. To warrant a reversal in this case, the alleged error must be of so plain and shocking a nature as to vitiate the absence of objection. In light of the prosecutor's assurance that the State had proffered all its available evidence, and the instruction of the court that the jury's decision was to be based "solely on the evidence presented," we cannot say the prosecutor's remarks were so egregious as to constitute plain error.

## (C).

 Defendant also urges reversal on the ground that the prosecutor in his summation improperly insinuated that defense counsel had attempted to suppress material evidence. The prosecutor said:

"I think there was an attempt to cover up some pertinent information as to when and where this cigarette case was found."

The location of defendant's cigarette case immediately following the homicide was an issue at the trial. The defense relied in part on the alleged taking of the case by Callis to prove its defense of homicide to prevent an attempted robbery. Defendant at trial testified on his direct examination that he had the case when he entered the Rialto on May 12, that he did not have it when he was arrested following the homicide, and that the next time he saw it was on May 13 when it fell out of a pile of Callis' clothing at the police station. The State called a rebuttal witness, a police officer, who testified that the case was found immediately following the homicide in the vicinity of the theater seat defendant had occupied. Defendant in support of the proposition that the prosecutor's remarks were completely without foundation asserts in his brief:

"There is no indication on the record that defense counsel were even aware of the circumstances of its discovery until the State produced it and offered it as rebuttal evidence."

But on cross-examination of the State's witness, Ruff, the theater maintenance man, defense counsel elicited the fact that the cigarette case was found following the homicide on the floor of the theater. In view of defense counsel's knowledge of its location, defendant's testimony, which could be taken to imply that the case was taken by and in the possession of Callis, would understandably provoke the prosecutor to comment as he did. In his summation, the prosecutor

emphasized the fact that the case was found in the theater and not on Callis' body. His reference to "an attempt to cover up some pertinent information" underscored the State's contention that defendant's testimony was designed to induce the belief that the case was found in Callis' clothes when in fact it was not. We have held that "not every suspected deviation from perfection on the part of a prosecutor will justify a reversal of a conviction. Before such a result ensues, his infraction must be clear and unmistakable and must substantially prejudice the defendant's fundamental right to have the jury fairly evaluate the merits of his defense." *State v. Bucanis,* 26 *N. J.* 45, at *p.* 56 (1958). Moreover, we may infer from counsel's failure to object to the remark at the time it was made that he did not consider it, in the atmosphere of the trial, out of bounds. *State v. Johnson, supra,* 31 *N. J.,* at *p.* 511. Any prejudice inherent in this remark could have been readily corrected had the defendant invoked the trial court's aid. See *State v. Vaszorich,* 13 *N. J.* 99, at *p.* 119 (1953). In any event, we cannot say that the challenged remarks, in the entire context of the trial, constituted plain error. See *State v. Buffa,* 31 *N. J.* 378 (1960).

## (D).

The defendant next contends that plain error inhered in the prosecutor's invitation to the jury to speculate whether defendant would have killed Ruff or Rumpf if each had not answered to defendant's satisfaction when he asked, "Are you one of them?" The evidence showed that the defendant had just fatally wounded Callis; that he approached Ruff and Rumpf with a drawn knife pointed at Ruff; that he asked if they each were one of them; and that he appeared intent upon seeking the man he had just stabbed. In view of this evidence, we cannot say the prosecutor's remarks constituted plain error. See *State v. Cioffe,* 128 *N. J. L.* 342 (*Sup. Ct* 1942) affirmed 130 *N. J. L.* 160

(*E. & A.* 1943), where a similar comment by the prosecutor in similar circumstances was held not reversible.

## (E).

Defendant also urges reversal on the ground that the prosecutor erroneously "instructed" the jury that a private person can never legally kill to prevent commission of a crime. These remarks, defendant argues, deprived him of his statutory defense that he killed one who was attempting to commit robbery. *N. J. S. A.* 2A:113–6. But it is clear that the prosecutor's remarks were based on the premise that the deceased attempted, if anything, to commit larceny. (*N. J. S. A.* 2A:113–6 does not extend the right to kill to cases of attempted larceny.) The here-challenged remarks were an exhortation to the jury to find that on the facts adduced deceased at worst attempted to perpetrate a larceny and that therefore the defendant had no right to kill. The prosecutor's remarks in the circumstances were a proper statement of the law. Additionally, the court instructed the jury that it was to be guided solely by instructions of the court as to the applicable rules of law. And the court correctly stated the law relative to justifiable homicide. Assuming the prosecutor had misstated the law, such an instruction would cure the error. *State v. Continental Purchasing Co. Inc.,* 119 *N. J. L.* 257 (*Sup. Ct.* 1938) affirmed 121 *N. J. L.* 76 (*E. & A.* 1938). In any event, the remarks of the prosecutor, in the context of his entire summation and in light of the court's instruction, do not constitute error of so plain and prejudicial a nature as to warrant reversal in the absence of objection.

## II.

Defendant's second general ground for reversal concerns alleged errors in the trial court's instructions to the jury. Again, defense counsel failed to object at the trial to the now-challenged instructions so that this court must find plain error to reverse.

## (A).

Defendant contends that the trial court committed plain error by charging the jury incorrectly on the law of self-defense. The court instructed as follows:

"Now, as the statute (*N. J. S. A.* 2A :113–6) stated under the law of our state a person who kills another in his own defense is guiltless and should be acquitted. It is the law of the state that no person is justified or excusable in taking the life of another unless the necessity for so doing is apparent as the only means to avoid his own destruction or some great injury and an accused may protect himself even to the extent of taking the life of another when such act is necessary or reasonably appears to be necessary in order to preserve his own life or to protect himself from serious bodily harm. However, the accused cannot make his judgment of the necessity of killing the deceased in order to defend himself the justification for his act. *Whether the necessity for killing the deceased existed must be determined by you the jury from the situation of the accused at the time of his act.*

If the injury apprehended by the accused could be otherwise avoided, the accused is bound to avoid the danger without resorting to violence and even if the circumstances were such as to require use of force to repel the assault upon him, he will be inexcusable if he carries on such a defense beyond the bounds of reasonable necessity.

*It is your province and duty to determine whether such necessity for the taking of the life of Franklin Callis existed from the situation of the accused Hipplewith at the time of his act.*" (Italics added)

The defendant contends that in the italicized portions of its charge the trial court required the jury to find that actual necessity existed for the taking of Callis' life in order to acquit. In the defendant's view, the trial court thus foreclosed consideration by the jury of whether in the circumstances the defendant reasonably believed that it was necessary to kill.

A person may kill in self-defense when the act of killing is necessary or reasonably appears to be necessary in order to preserve his own life or to protect himself from serious bodily harm. *State v. Bonofiglio*, 67 *N. J. L.* 239 (*E. & A.* 1901). The right of self-defense does not depend

upon a showing of so-called "actual" necessity. It is sufficient that defendant show he reasonably believed it necessary to kill. *State v. Mount,* 73 *N. J. L.* 582 (*E. & A.* 1906); *State v. Mellillo,* 77 *N. J. L.* 505 (*E. & A.* 1908); *State v. Lionetti,* 93 *N. J. L.* 24 (*Sup. Ct.* 1919); see *Wechsler and Michael, "A Rationale of The Law of Homicide,"* 37 *Colum. L. Rev.* 701, 736 (1937). Whether the act of killing was necessary or reasonably appeared to be necessary is to be determined by the jury, not the defendant, in light of the circumstances existing at the time of the homicide. *Brown v. State,* 62 *N. J. L.* 666 (*E. & A.* 1899) affirmed 175 *U. S.* 172, 20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899).

 In passing upon the propriety of a trial court's instruction, this court will examine the entire charge to see whether the jury was misinformed as to the controlling law. It is ordinarily impossible for the trial court to state all of the applicable law in one sentence. The test, therefore, is whether the charge in its entirety was ambiguous or misleading. Applying that test to the court's instruction in the present case, we find that the defendant was not prejudiced. On two separate occasions—instructing on the existence and the extent of the right of self-defense—the court told the jury that reasonable apprehension of necessity as well as actual necessity to kill is sufficient to excuse a homicide. Defendant asserts that in intervening portions of its charge the trial court confined the right of self-defense to instances of actual necessity. He cites the italicized parts of the above-quoted charge. In these parts of the charge the court was referring not to the circumstances under which the right of self-defense exists but to the fact that the subjective judgment of the defendant is not the test of justification for the act of killing. The court properly instructed the jury that it is their function and not the defendant's to determine whether there was justification for the homicide. *Brown v. State, supra.* In addition, the court referred in these parts of its charge to "the situation of the accused at the time of his act." The phrase "situation of the accused"

referred the jury to the court's preceding reference to what "reasonably appears to be necessary in order to preserve his own life." It would have perhaps been better had the court said: "whether the necessity existed or reasonably appeared to exist." In light, however, of the court's immediately preceding reference to the reasonable apprehension of the defendant, and the absence of any indication that the court intended to withdraw that part of the charge, we do not believe that the jury was misled.

Defendant cites *State v. Mount, supra,* and *State v. Lionetti, supra,* as cases wherein a conviction was reversed because the trial court omitted reference to reasonable apprehension of necessity in one part of its charge although it was included in another part. On appeal it was observed that the two parts of the instruction were inconsistent and there was no way of knowing by which the jury was guided. But in *Mount* and *Lionetti* the trial courts omitted the reference to reasonable apprehension of necessity when they were instructing on the existence of the right of self-defense, *i. e.,* the circumstances under which the right could be properly invoked. As mentioned above, the trial court in the present case expressly included reasonable apprehension in instructing on the existence of the right.

It is also to be noted that the trial court in the present case delivered the precise instruction on self-defense which was requested by defense counsel. Moreover, had counsel objected to the instruction when delivered, any ambiguity could have been corrected at that time. Accordingly, we find that the court's charge on self-defense did not constitute plain error.

(B).

Defendant urges that the trial court committed plain error by instructing the jury that they were not to consider themselves responsible for the consequences of their verdict. In the course of its charge to the jury, the trial court said:

"Now, ladies and gentlemen of the jury, you are charged with the most solemn duty that the law can impose upon you as citizens, the determination of the question of the extinction of human life by official decree. The responsibility that rests upon you is a grave one. You should let your verdict be in accord with the evidence. Remember that you are here as vindicators of the law, charged with the high responsibility of your position. Be mindful on the one hand of your obligation to this defendant and on the other hand of what is due to public justice.

*You should let no fear of responsibility deter you from discharging your duties faithfully.*

*For the consequences that may follow your verdict neither you nor this Court is responsible.*

*When we have discharged our duties conscientiously and firmly, our responsibilities are at an end and we may leave the consequences to the law.*" (Italics added)

▇▇▇ In certain circumstances, it is reversible error for a trial court to deliver an instruction which dilutes the jury's sense of responsibility. This court has reversed, for example, where the trial court directed attention to the fact that subsequent decision-makers in the criminal process would reappraise the jury's finding. *State v. White,* 27 *N. J.* 158 (1958); *Aponte v. State,* 30 *N. J.* 441 (1959); *State v. Mount,* 30 *N. J.* 195 (1959). The error of such an instruction lies in the encouragement of the jury to compensate for possible future clemency by imposing a harsher punishment than the evidence warrants, or to rely upon subsequent review to correct an erroneous finding as to guilt. There was no such danger in the instruction delivered by the trial court in the present case. That court did not alert the jury to the possibility of subsequent review but informed them that when they arrived at a verdict warranted by the evidence, the consequence is determined by law.

▇▇▇▇ But in New Jersey the jury is directed by statute to determine appropriate punishment in first degree murder cases. If it does not expressly recommend life imprisonment, the sentence is death. *N. J. S. A.* 2*A*:113–4. To this extent, the jury is concerned with the consequences of its verdict. An instruction that the law is responsible therefor, as given in the present case, is erroneous because it tends to dilute the

jury's sense of responsibility in the exercise of its sentencing function. *State v. Mount, supra.* But for the defendant to show prejudice, the jury must have returned a verdict of murder in the first degree without recommendation of life imprisonment. In the present case the jury, finding the defendant guilty of first degree murder, imposed the lesser of the two possible sentences—life imprisonment rather than death. Therefore, the instruction that the law was responsible for the consequences attendant upon the jury's verdict, though erroneous, could not have prejudiced the defendant, and hence is no ground for reversal.

### III.

Defendant's final argument is that the allegedly erroneous remarks of the prosecutor and instructions of the trial court in the aggregate deprived defendant of a fair trial. After a careful examination of the record and all of the challenged remarks and instructions, and in light of the fact that none of the alleged errors impressed defense counsel as improper in the atmosphere of the trial, we are satisfied that defendant was not deprived of a full and fair hearing. We find no error in the judgment below and it is accordingly affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO—7.

*For reversal*—None.