NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4341-16T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

BROOKE L. HOFFMAN,

      Defendant-Appellant.[1]

_____

> Submitted May 1, 2019 – Decided May 28, 2019
>
> Before Judges Nugent, Reisner, and Mawla.
>
> On appeal from Superior Court of New Jersey, Law Division, Middlesex County, Indictment No. 14-12-1340.
>
> Joseph E. Krakora, Public Defender, attorney for appellant (Stephen P. Hunter, Assistant Deputy Public Defender, of counsel and on the brief).
>
> Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (David M. Liston, Assistant Prosecutor, of counsel and on the brief).

---

[1] This appeal was calendared back-to-back with State v. Martin, No. A-1224-17.

PER CURIAM

Convicted by a jury of seven crimes and four disorderly persons offenses she committed during the home invasion and robbery of an elderly couple, and sentenced to an aggregate prison term of eleven years and six months, defendant, Brooke L. Hoffman, appeals from the Judgment of Conviction (JOC). She argues that three mistake-laden instructions the trial court gave to the jury, none of which she objected to, deprived her of a fair trial. She also argues that the sentencing judge committed numerous errors. Finding no plain error in the challenged charges, we affirm defendant's conviction. Finding inadequate the sentencing judge's explanation for imposing consecutive sentences, we vacate the terms of the JOC imposing consecutive sentences and remand for reconsideration and resentencing as to that issue only.

I.

In December 2014, a Middlesex County grand jury, in eighteen counts of a twenty-count indictment, charged defendant and co-defendants, Antoine Martin and Robert Peterson, with the following crimes: second-degree conspiracy, N.J.S.A. 2C:5-2 (count one); first-degree robbery, N.J.S.A. 2C:15-1 (counts two and three); second-degree kidnapping, N.J.S.A. 2C:13-1(b) (counts four and five); second-degree burglary, N.J.S.A. 2C:18-2 (count six);

2

third-degree criminal restraint, N.J.S.A. 2C:13-2 (counts seven and eight); third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (counts nine and ten); fourth-degree possession of prohibited devices, N.J.S.A. 2C:39-3(h) (count eleven); second-degree unlawful possession of a firearm, N.J.S.A. 2C:39-5(b) (count twelve); fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d) (count thirteen); third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4(d) (count fourteen); second-degree theft by extortion, N.J.S.A. 2C:20-5(a) (count fifteen); third-degree theft by unlawful taking, N.J.S.A. 2C:20-3(a) (count sixteen); fourth-degree criminal mischief, N.J.S.A. 2C:17-3(b)(8) (count seventeen); and third-degree receiving stolen property, N.J.S.A. 2C:20-7 (count nineteen).

In addition, the grand jury charged Peterson with hindering his own apprehension, N.J.S.A. 2C:29-3(b)(1), and Martin with hindering his own apprehension, N.J.S.A. 2C:29-3(b)(4).

Before defendant's jury trial began, the State dismissed the kidnapping counts, four and five. The State tried defendant separately from her co-defendants. Defendant's trial took place during nine non-consecutive days in October and November, 2016. The jury rejected defendant's defense of duress and convicted her of the following offenses: second-degree conspiracy, N.J.S.A.

2C:5-2 (count one); two counts of the lesser-included disorderly persons offenses of theft by unlawful taking, N.J.S.A. 2C:20-3(a) (counts two and three); second-degree burglary, N.J.S.A. 2C:18-2 (count six); two counts of the lesser-included disorderly persons offense of false imprisonment, N.J.S.A. 2C:13-3 (counts seven and eight); two counts of third-degree terroristic threats, N.J.S.A. 2C:12-3(a) (counts nine and ten); fourth-degree possession of a stun gun, N.J.S.A. 2C:39-3(h) (count eleven); second-degree theft by extortion, N.J.S.A. 2C:20-5(a) (count fifteen); and fourth-degree criminal mischief, N.J.S.A. 2C:17-3(b)(8) (count seventeen).

Five months after the jury trial, a judge who had not presided over the trial sentenced defendant. On count eleven, fourth-degree possession of a stun gun, the judge imposed a sixteen-month jail term and ordered defendant to serve the sentence for this offense first. On count seventeen, fourth-degree criminal mischief, the judge imposed an eighteen-month jail term, consecutive to count eleven, possessing a stun gun. The judge ordered defendant to serve the sentence for criminal mischief second, before any of the remaining sentences. On each of counts six, second-degree burglary, and fifteen, second-degree theft by extortion, the judge imposed a nine-year jail term subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, concurrent to each other but

consecutive to the sentence on count seventeen, criminal mischief. On the two counts of false imprisonment, counts seven and eight, the judge imposed six-month jail terms, concurrent to each other and to the sentences he imposed on counts six and fifteen, burglary and theft by extortion. The judge merged the remaining counts.

## II.

During defendant's trial, the State presented the testimony of three police witnesses, the two victims, and co-defendant Peterson. The State also introduced photographs, physical evidence, and a recording of defendant's confession. Defendant testified on her own behalf.

The State established the following facts. On an August morning in 2014, two men and a woman, two masked, one not, entered the home of Mr. and Mrs. Lawrence. One intruder stayed in the kitchen with the elderly couple while the others searched the home and ransacked the bedroom, destroying closet doors, strewing the couple's belongings about the room, and breaking many of their possessions. Although the victims did not immediately recognize the female intruder, whose face was covered, they realized during the home invasion that she was defendant, the mother of their great grandson.

5

Mrs. Lawrence, age eighty-two when she testified at trial, recounted the following events. Several years ago, defendant and Mrs. Lawrence's grandson had a baby. Mrs. Lawrence was fond of defendant and the baby. Early on the morning of the incident, Mrs. Lawrence had driven to defendant's home to take her to the bank. Inexplicably, defendant never came out, so Mrs. Lawrence returned to her home.

Mrs. Lawrence was preparing lunch when the first intruder entered her home. He left and returned a short time later, followed by two others. Two of the intruders went to the bedroom, where her husband was resting, and brought him into the kitchen. The taller intruder, later identified as co-defendant Peterson, remained in the kitchen with the Lawrences and held Mrs. Lawrence at knifepoint through most of the ordeal.

The intruders repeatedly demanded the "blue box" and the money. They refused to believe Mrs. Lawrence's protests that she and her husband had been robbed many times and had no money. One of the intruders, later identified as Martin, repeatedly threatened her and her husband. First, he threatened to burn down her house and cause a lot of damage if they didn't give him money. At one point, he went into the bedroom, found a figurine clock that belonged to Mrs. Lawrence, and smashed it. A short time later, he found her husband's

handgun and two Tasers. Martin threatened to shoot Mr. Lawrence if the Lawrences did not give him money. Another time, he threatened to use the Tasers on them. A third time, he told Peterson to put a knife to Mrs. Lawrence's throat and stab her if she moved.

Defendant and Martin searched the bedroom, where they caused considerable damage. Defendant, whom Mrs. Lawrence described as the girl, also searched the attic and the cellar. Mrs. Lawrence explained that defendant and Martin were going through the house. Defendant was whispering to him where to go. Mrs. Lawrence described how at one point Peterson put down the knife and began playing with one of the Tasers. She grabbed the knife, ran to the back door, and screamed to the neighbor for help. Peterson caught her, grabbed her shoulder, and she fell. She could not get up. He picked her up, sat her down, and told her not to reach for the knife, or he would Taser her.

Peterson then called out, "Antoine, are you done yet[?]" There was no answer. He then called out, "Brooke." Mrs. Lawrence said she was shocked, as she now realized who defendant was.

Peterson realized the others had left through the front door. He told the Lawrences to watch the clock for five minutes. He left through the back door.

Because the intruders had broken the telephones in the house, Mr. Lawrence scurried to a nearby business and called the police. They responded within minutes. A short time after they arrived, a police car came to the house. Peterson was in the car. Mrs. Lawrence identified him.

Mr. Lawrence was almost eighty-five years old when he testified at trial. His testimony, with some discrepancies, corroborated his wife's testimony. He testified that the intruders took two boxes of the Lawrences' possession when they fled, including Mr. Lawrence's dog tags from the service.

Michele Arancio, a police dispatcher, received Mr. Lawrence's emergency call at noon and dispatched officers to his home. Once police "cleared" the house, they began patrolling surrounding areas. After receiving information about the possible location of one suspect, Detective Shaun Clifford and other detectives arrested Peterson as he was exiting the bathroom of a salon in a nearby strip mall. Peterson emerged shirtless. The detective found the red t-shirt Peterson had been wearing in the bathroom. The police also recovered a knife in the area between the house and the salon where Peterson was apprehended, and later recovered a Taser hidden in the dropped ceiling above the toilet in the bathroom from which Peterson emerged immediately before police arrested him.

Peterson was transported to the victims' home, where they identified him. Lieutenant Daniel Noonan advised Peterson of his Miranda[2] rights and then questioned him. Initially reluctant to give names, but apparently angry because the others had left him at the victims' home, Peterson named defendant and Martin, whom Peterson knew as "Brooklyn."

Police officers drove to the apartment complex where Martin lived. They found the car the perpetrators had used, looked up registration information from the license plate number, and determined where the registered owner lived. Officers telephoned the apartment, Martin came out, and police arrested him. Martin's wife consented to a search of the apartment. When police searched it, they seized various possessions that had been taken from the Lawrences' home, including Mr. Lawrence's handgun and one of the Tasers. During the search, they found defendant hiding under a pile of clothes in a closet. When arrested, she claimed she was a juvenile and gave her name as Courtney Hoffman. The police transported her to the police station where she confessed after waiving her Miranda rights. At trial, the prosecutor played a DVD of defendant's confession.

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-4341-16T4

Co-defendant Peterson testified for the State. Peterson pled guilty to first-degree robbery in exchange for the prosecutor's agreement to recommend a ten-year prison term subject to NERA. Peterson, who was twenty-one years old when he testified, said he had known defendant since middle school. They recently renewed their friendship at a memorial service for a mutual acquaintance and soon thereafter entered into a relationship. Peterson had been staying with defendant for approximately three weeks before committing their crime.

According to Peterson, approximately a week after he began staying with defendant, she talked about robbing the Lawrences. At first, he refused to participate. However, he needed money. So when defendant brought up the subject again, he agreed. Defendant mentioned that the Lawrences had a granddaughter who had previously stolen from them successfully.

On the morning of the robbery, Peterson, then eighteen years old, agreed with defendant to rob the Lawrences. He called Martin, whom he referred to as Brooklyn, to drive.

The Lawrences were not supposed to be home. Defendant was supposed to call Mrs. Lawrence and ask her to pick up her son. Peterson recounted the events of the home invasion. His account essentially corroborated that which

had been given by Mrs. Lawrence. Peterson said the incident lasted approximately one-half hour. During that time, in addition to searching the house for money, defendant signaled him to punch Mr. Lawrence. He declined to do so.

Defendant, age twenty-one at the time of trial, testified on her own behalf. She admitted to her involvement in the robbery but claimed she did not voluntarily participate. Rather, she claimed Peterson threatened her. Defendant claimed the robbery was Peterson's idea. He threatened to shoot her and her three-year-old son if she did not help him.

According to defendant, Peterson began staying with her approximately three weeks before the robbery. On the morning of the robbery, defendant needed to go to the bank. She asked Peterson for a ride. He then called a man she did not know. When the man showed up at her apartment, she and Peterson got in the car to go to the bank.

On the way to the bank, the man who was driving stopped at his apartment. She and Peterson waited outside the car. That is when Peterson first mentioned the robbery. He said he was going to get some money and she was going with him. He asked her for the number of the Lawrences' granddaughter. His phone

A-4341-16T4

did not work, so she telephoned the granddaughter, who said her grandparents kept their money in their shoes, in the bedroom, under their bed.

Defendant repeated the answers out loud so that Peterson could hear her. Defendant started to walk away. Peterson grabbed her. They argued. He said he was going to rob the Lawrences and she was going with him. He said he did not intend to leave any witnesses. Defendant replied that he would get caught. Defendant claimed Peterson perceived this as a threat to tell on him, and in response, he said "[w]ell, now you know about it and you have to come with me." He threatened to have her and her son shot if she did not go with him.

Defendant reacted by screaming and punching Peterson. He wrapped his arms around her and pulled her back into the car. By then, Martin and another young man had arrived at the car. Martin drove to the Lawrences' home while she sat in the back seat and cried. Peterson gave Martin directions to the Lawrences' home.

When they arrived, Peterson pushed defendant out of the car and tied a t-shirt around her face, covering her entire face except her eyes. Defendant testified that Peterson and the other young man — not Martin — entered the Lawrences' home with her. Peterson had a grip around defendant's arm and was pushing her toward the house. Defendant was scared, thinking only about her

son. She knew the type of people Peterson hung out with and she believed he was capable of carrying out his threats.

After entering the home, Peterson shoved defendant away and walked toward the kitchen. Defendant walked behind Peterson, and the third man walked behind her. Defendant assumed the Lawrences would be home, because there was no reason she knew of why they would be away. Defendant recounted the details of the home invasion, which were consistent with Mrs. Lawrence's testimony. Defendant denied taking any money. She claimed she took nothing. Rather, she pretended to rummage through the house and help the other man. She saw the other man break some things, but did not see him actually steal anything.

Defendant and the other man were walking back toward the kitchen when Mrs. Lawrence attempted to run. Peterson ran after her. Sensing this was her chance to get away, defendant ran out of the house through the front door. The other man followed. They drove off without Peterson.

The three drove to Martin's apartment. She went in. The other man left. When the police knocked on Martin's apartment door, Martin told her to hide in a closet, which she did. He told her to stay there and keep quiet. The police

eventually found her and transported her to the police station, where she gave a formal, videotaped statement.

Defendant testified she did not tell the police that Peterson had threatened her. She was scared, he knew where she lived, and he knew where her father lived. She was concerned for her son. Therefore, she never told anyone about the threat, because she feared Peterson would carry it out.

Defendant was in court when Peterson pled guilty. She could no longer get him in trouble, because he admitted what he did. Because he could no longer turn around and say she got him in trouble, she now felt as though she could disclose how he had threatened her. She was able to tell her story for the first time.

During cross-examination, defendant admitted she gave a false name to police when they found her in Martin's closet. She denied being aware that the third person who entered the Lawrences' home was Martin. Confronted with her statement to the police naming Martin as the third robber, she said she did so because the police told her Martin had been in the house.

The jury deliberated over five days. During their second day of deliberations, the jurors submitted the following question to the court:

> If we were to find that the defendant was under duress, can we find that she was under duress for some of the

14

counts charged or must it be a defense for all the counts charged?

After the court and counsel received the question, the court stated:

> I think you would agree, that if . . . duress applies to one count, it applies to all. And I'm hesitant to answer directly anything without referring to the charge, but how do you want me to respond to [the question]?

In response to the court's question, defense counsel repeatedly insisted the defense of duress applied to all counts. Defense counsel stated:

> [Defense Counsel]: Judge, I'd just refer them back to the instructions and answer it the way you just answered it. I mean, it's all or nothing in this case. It isn't like she just happened to –
>
> [The Court]: Well, all the counts, I believe, are identified, including the lessers in the first paragraph of duress. The charge.
>
> So I can say I'll refer you back to duress which they have, but – and you'll note that all counts are included as a defense.
>
> [Defense Counsel]: Right, but the answer to [the question], though, I think should be refer[red] to duress, but the answer is no. It's – the argument in this case by the defense is that duress applies to everything. That's – it's not applying to half of it all – it's all of it.
>
> [Prosecutor]: Well, I think that's in your answer. You're saying look – the duress instruction relates to all counts charged.
>
> [The Court]: Yeah.

A-4341-16T4

[Defense Counsel]: I just wouldn't want to be vague where they hear that and they go back to re-read it and everything and then I'd just make it clear to them that the answer to the question literally is no, comma, go back and refer to duress, not that all the charges are included in that charge that you have in the jury room.

[The Court]: Oh, I see. Yeah, right. No. Yeah.

When the jury returned, the court instructed them as follows:

All right. I have your questions. First question is: "If we were to find that the defendant was under duress, can we find that she was under duress for some of the counts charged or must it be a defense for all the counts charged?"

My answer is this: I refer you back to the duress charge itself contained pages [seventeen] and [eighteen] and this: if you find duress applies, then it applies to all the counts.

The jury deliberated three more days before returning its verdict. After defendant was sentenced, she filed this appeal.

### III.

On appeal, defendant raises the following points:

POINT I
WHEN THE JURY ASKED WHETHER IT COULD DETERMINE THAT DURESS APPLIED TO SOME COUNTS, BUT NOT OTHERS, THE TRIAL COURT WRONGLY INSTRUCTED THAT DURESS COULD ONLY APPLY TO ALL THE COUNTS. THIS

16

IMPROPER INSTRUCTION REQUIRED THE JURY TO TAKE AN ALL-OR-NOTHING APPROACH TO DURESS AND THUS DENIED DEFENDANT A FAIR TRIAL. U.S. Const. Amend. XIV; N.J. Const. Art. I, ¶ 1. (Not Raised Below).

POINT II
THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY ISSUING AN UNCONSTITUTIONAL INSTRUCTION ON FLIGHT AS CONSCIOUSNESS OF GUILT. U.S. Const. Amend. XIV; N.J. Const. Art. I, ¶ 1 (Not Raised Below).

POINT III
THE TRIAL COURT INCORRECTLY LIMITED THE BIELKOWICZ INSTRUCTION FOR ACCOMPLICE LIABILTY TO CRIMINAL RESTRAINT, REQUIRING REVERSAL OF DEFENDANT'S BURGLARY CONVICTION. U.S. Const. Amend. XIV; N.J. Const. Art. I, ¶ 1, 10 (Not Raised Below).

POINT IV
NUMEROUS SENTENCING ERRORS REQUIRE A REMAND FOR RESENTENCING. U.S. Const. Amend. VIII, XIV; N.J. Const. Art. I, ¶¶ 1, 12.

We first address defendant's three points challenging jury instructions.

A.

Defendant requested the duress instruction she now challenges in her brief's first point. Her challenge on appeal to the instruction she requested at trial implicates the doctrine of invited error. The doctrine "is designed to prevent defendants from manipulating the system." State v. Jenkins, 178 N.J.

17

347, 359 (2004). Thus, a "defendant cannot beseech and request the trial court to take a course of action, and upon adoption by the court, take his chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he sought and urged, claiming it to be error and prejudicial." State v. Harper, 128 N.J. Super. 270, 277 (App. Div. 1974) (citing State v. Pontery, 19 N.J. 457, 471 (1955). "Trial errors which were induced, encouraged or acquiesced in or consented to by defense counsel ordinarily are not a basis for reversal on appeal." Ibid.

Such is the case here. We find no error in the instruction the trial court gave in response to the jury's question about duress. Nothing in the evidence or in defendant's testimony supported a finding that defendant at times acted under duress and at times did not. Nonetheless, defendant insisted the court give the instruction it gave. Under those circumstances, and absent a compelling reason to overlook the doctrine of invited error, defendant may not manipulate the system by urging as error on appeal the action she urged the court to take at trial.

B.

Defendant did not object to the flight and accomplice liability instructions she now challenges in her brief's second and third points. We find plain error in neither instruction.

When a defendant does not object to a jury instruction at trial, an appellate court reviews the charge for plain error. R. 1:7-2; R. 2:10-2; State v. McKinney, 223 N.J. 475, 494 (2015). Plain error is a "[l]egal impropriety in the charge prejudicially affecting the substantial rights of the defendant sufficiently grievous to justify notice by the reviewing court and to convince the court that of itself the error possessed a clear capacity to bring about an unjust result." State v. Adams, 194 N.J. 186, 207 (2008) (alteration in original) (quoting State v. Jordan, 147 N.J. 409, 422 (1997)). Such is not the case here.

This is the instruction the judge gave the jury on flight:

> There has been some testimony in the case from which you may infer that the defendant fled shortly after the alleged commission of the crime. The defense has suggested the following explanation: That she left because she was in fear of Robert Peterson. If you find defendant's explanation credible, you should not draw any inference of the defendant's consciousness of guilty [sic] from the defendant's departure.
>
> If after consideration of all of the evidence, you find that the defendant, fearing that an accusation or arrest would be made against her on the charge involved in the indictment, took refuge in flight for the purpose of evading the accusation or arrest, then you may consider such flight in connection with all the other evidence in the case, as an indication or proof of a consciousness of guilt. It is for you as judges of the fact to decide whether or not the evidence of flight shows a consciousness of guilt and the weight to be

given such evidence in light of all of the other evidence in the case.

Defendant argues the wording of this instruction shifted to defendant the burden of disproving she fled due to consciousness of guilt and did not make clear the State's burden to prove defendant fled because of consciousness of guilt. We disagree.

Defendant's argument is based on a misinterpretation and misconstruction of the instruction. Nothing in the instruction expressly states defendant had any burden. That defendant did not raise the issue when repeatedly given the opportunity to do so at trial – where she heard the manner and context in which the instruction was delivered – suggests the instruction did not connote what defendant now ascribes to it in hindsight. See State v. Singleton, 211 N.J. 157, 182 (2012) ("If the defendant does not object to the charge at the time it is given, there is a presumption that the charge was not error and was unlikely to prejudice the defendant's case.") (citing State v. Macon, 57 N.J. 325, 334-34 (1971)).

Defendant admitted at trial she fled the scene after Mrs. Lawrence attempted to escape through the front door of her house. Defendant also admitted that she and Martin left Peterson behind and that she hid from police in Martin's bedroom closet. She claimed to have done all these things out of fear that Peterson would harm her and her child. The court adequately instructed

A-4341-16T4

the jurors on the competing inferences they could accept or reject as to why defendant fled and hid. Moreover, in view of defendant's admission that she participated in the home invasion, fled from the scene and the police, and gave the police a false name when found, the trial court's instruction on flight, even if error, was not clearly capable of producing an unjust result. Adams, 194 N.J. at 207.

Nor was the alleged error in the accomplice liability charge clearly capable of bringing about an unjust result. Defendant argues that in part of the charge, by limiting the instruction on accomplice liability to criminal restraint, the trial court erred, thus requiring reversal of her conviction of burglary. But we must examine the entire charge to see whether it was ambiguous or whether it misinformed the jury of the law. State v. R.B., 183 N.J. 308, 324 (2005); State v. Hipplewith, 33 N.J. 300, 317 (1960). Considered as a whole, the charge adequately informed the jury of the principles of law concerning accomplice liability. Defendant's arguments to the contrary are without sufficient merit to warrant further discussion. R. 2:11-3(e)(2).

IV.

Last, we address defendant's arguments concerning her sentence. She contends: (1) criminal mischief should have merged with theft by extortion

because the damaging of the Lawrences' house phones was part of the threats that were used to extort the Lawrences; (2) the judge gave no reasons for imposing three consecutive sentences, which was not supported by the facts, as there were only two victims; (3) the judge failed to give reasons for directing the order of the consecutive sentences in such a manner as to impose an additional period of parole ineligibility; and (4) the judge failed to address mitigating factors raised by defense counsel in imposing an excessive sentence that exceeded the prosecutor's recommendation.

The first and fourth arguments are without sufficient merit to warrant discussion. R. 2:11-3(e)(2). Finding merit in defendant's second and third arguments, we vacate the judgment of conviction's terms imposing consecutive sentences and remand for resentencing as to whether the sentences should be concurrent or consecutive. The sentencing judge shall afford the parties ample opportunity to be heard as to those issues and shall explain the reasons for the sentencing decision.

In sentencing defendant, the sentencing judge did not explain why he was imposing consecutive sentences or why he was ordering defendant to serve the sentences in a specific sequence. "When a trial court fails to give proper reasons for imposing consecutive sentences at a single sentencing proceeding, ordinarily

a remand should be required for resentencing." State v. Carey, 168 N.J. 413, 424 (2001) (citing State v. Miller, 108 N.J. 112, 122 (1987)). In addition, when "imposing a least restrictive or flat prison term preceding a more restrictive prison term, the court is directed to explain the consequence of any sequencing and to justify its exercise of discretion to impose the specific real-time consequence based on the court's finding and weighing of aggravating factors." State v. Pierce, 220 N.J. 205-06 (2014) (citing State v. Ellis, 346 N.J. Super. 583, 597 (App. Div. 2002).

The State argues that we can infer from the sentencing record the reasons for both the trial court's imposition of consecutive sentences and the sequencing of those sentences; and, further, that such inferred reasons satisfy the criteria for imposing consecutive sentences. We decline to do so. "[A]ppellate courts should exercise original sentencing jurisdiction sparingly." Carey, 168 N.J. at 424 (citing State v. Kromphold, 162 N.J. 345, 355 (2000)). Remand is the "preferred procedure" because "the trial court may restructure the sentence on remand without violating the defendant's due process or double jeopardy rights, so long as the defendant's aggregate sentence is not increased." Ibid. (citing State v. Rodriguez, 97 N.J. 263, 277 (1984)). We thus remand for resentencing.

Affirmed in part, vacated in part, and remanded in part for a further sentencing proceeding consistent with this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4341-16T4