273 N.J. Super. 6 (1994)
640 A.2d 1176
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
ANGEL MATOS, DEFENDANT-APPELLANT. IN THE MATTER OF ANGEL MATOS.
Superior Court of New Jersey, Appellate Division.
Argued April 20, 1994.
Decided May 4, 1994.
*8 Before Judges SHEBELL, LONG and LANDAU.
Linda Mehling, Assistant Public Defender, argued the cause for appellant (Susan L. Reisner, Acting Public Defender; Ms. Mehling, of counsel and on the brief).
Michael Cunningham, Assistant Prosecutor, argued the cause for respondent (John Kaye, Monmouth County Prosecutor; Mark P. Stalford, Assistant Prosecutor, of counsel; Stacy H. Gaffney, Assistant Prosecutor, on the letter brief).
The opinion of the court was delivered by SHEBELL, P.J.A.D.
In these consolidated appeals, defendant, Angel Matos, seeks to enforce the terms of a plea bargain, and to dismiss as without authority, his citation for contempt under N.J.S.A. 2A:81-17.3 for refusal to testify against his co-defendant, Miguel Alvarez.
Defendant was charged in a single indictment with crimes that took place on three different dates. The following charges relate to incidents occurring on July 26, 1991, and August 2, 1991: possession of a controlled dangerous substance, namely cocaine, N.J.S.A. 2C:35-10a(1) (count one); possession of a controlled dangerous substance, namely cocaine, within 1,000 feet of a school zone, N.J.S.A. 2C:35-10 (count two); possession of a controlled *9 dangerous substance, namely cocaine, in the second degree, with the intent to distribute, N.J.S.A. 2C:35-5b(2) (count three); possession of a controlled dangerous substance, namely cocaine, with the intent to distribute within 1,000 feet of a school zone, N.J.S.A. 2C:35-7 (count four); distribution of a controlled dangerous substance, namely cocaine, in the second degree, N.J.S.A. 2C:35-5b(2) (count five); and distribution of a controlled dangerous substance, namely cocaine, within 1,000 feet of a school zone, N.J.S.A. 2C:35-7 (count six).
The remaining charges in the indictment, counts numbered seven through thirteen, involve incidents occurring on August 17, 1991. Along with defendant, two co-defendants, Miguel Alvarez and Israel Rivera, were named in these counts only. All three were charged with the following: possession of a controlled dangerous substance, namely cocaine, N.J.S.A. 2C:35-10a(1) (count seven); possession of a controlled dangerous substance within 1,000 feet of a school zone, N.J.S.A. 2C:35-10 (count eight); possession of a controlled dangerous substance, namely cocaine, with the intent to distribute in the second degree, N.J.S.A. 2C:35-5b(2) (count nine); possession of a controlled dangerous substance, namely cocaine, with the intent to distribute within 1,000 feet of a school zone, N.J.S.A. 2C:35-7 (count ten); distribution of a controlled dangerous substance, namely cocaine, in the second degree, N.J.S.A. 2C:35-5b(2) (count eleven); distribution of a controlled dangerous substance, namely cocaine, within 1,000 feet of a school zone, N.J.S.A. 2C:35-7 (count twelve); and conspiracy to distribute a controlled dangerous substance, namely cocaine, in the second degree, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5 (count thirteen).
Defendant and his attorney negotiated the terms for a written plea agreement with the Monmouth County Prosecutor's Office. Pursuant to the plea agreement, defendant appeared before the Law Division judge on July 1, 1992. Defendant was placed under oath and questioned about the agreement by the judge and the assistant prosecutor. Because defendant answered questions differently *10 than what was anticipated by the assistant prosecutor, the proceedings were concluded without acceptance of the guilty plea.
Subsequently, defendant made a motion to enforce the plea agreement of July 1, 1992. This motion was heard and denied on November 10, 1992. Pursuant to an "open plea," defendant pled guilty that same day to counts five, six, eleven, twelve, and thirteen of the indictment. Sentencing was scheduled for December 11, 1992.
The assistant prosecutor requested a forty-five day adjournment of sentencing, in order to explore the possibility of defendant testifying voluntarily on behalf of the State at the trial of co-defendant Alvarez. On January 15, 1993, defendant was sentenced. The judge merged counts twelve and thirteen into count eleven, and count six into count five. On count five, defendant was sentenced to the custody of the Commissioner of the Department of Corrections for a period of seven years, with three years of parole ineligibility. Defendant was also ordered to pay a $2,000 Drug Enforcement Demand Reduction (DEDR) penalty, a $50 lab fee, and a $30 Violent Crimes Commission Board (VCCB) penalty. His driving license was suspended for six months. The same sentence was imposed on count eleven to run concurrently with that imposed on count five, except that the license revocation of six months for each count was not to run concurrently. Defendant was given credit for 518 days already spent in custody. The remaining counts were dismissed.
Defendant filed a motion for leave to appeal nunc pro tunc. This was granted on April 7, 1993.
The prosecutor filed a petition with the Attorney General for permission to seek immunity for the defendant. On August 19, 1993, the prosecutor, defendant and defense counsel appeared in open court before the judge who was to try the co-defendant, Miguel Alvarez. At this hearing, the judge entered an order *11 approving the grant of immunity and compelling defendant to testify with that immunity at the trial.[1] The prosecutor stated:
I have been asked by the Attorney General, prior to actually entering the Order, to have Your Honor make another determination that Mr. Matos still wishes to invoke his privilege.
The judge then held defendant in contempt because defendant stated he did not intend to testify despite the grant of immunity. On August 26, 1993, defendant filed a notice of appeal from this order.
On October 4, 1993, defendant appeared before the same judge and agreed to testify. After a hearing, the judge ordered that defendant be purged of contempt. Since the judge had been on vacation when defendant had made his decision to testify, it was found that defendant purged himself of contempt on September 30, 1993. Defendant did not receive credit on his jail sentence while he was in the Monmouth County Correctional Institute from August 19, 1993 to September 30, 1993, on the contempt charge.
We granted defendant's request for consolidation of the appeals from the judgment of conviction on the indictment and from the contempt citation.
In his brief on appeal, defendant raises the following legal arguments:

POINT I: PRINCIPLES OF FUNDAMENTAL FAIRNESS MANDATE THAT THIS COURT ENFORCE THE TERMS OF THE PLEA BARGAIN DEFENDANT AND THE STATE ENTERED INTO ON JULY 1, 1992. U.S. CONST. AMENDS. V, XIV; N.J. CONST. (1947), ART. 1, PARS. 1, 9, 10.

POINT II: SINCE THE TRIAL COURT LACKED THE AUTHORITY TO HOLD DEFENDANT IN CONTEMPT OF COURT IN ADVANCE OF THE CO-DEFENDANT'S TRIAL, DEFENDANT SHOULD BE GRANTED JAIL CREDIT ON HIS PRISON SENTENCE FOR THE PERIOD OF TIME THAT HE WAS INCARCERATED UNDER THE CONTEMPT ORDER.
The underlying facts are that on July 26, 1991, defendant sold one-half ounce of cocaine for $450 to an undercover police officer at a Burger King Restaurant in Hazlet. This purchase was made *12 after arrangements had been made by a confidential informant. The police officer contacted defendant a second time on August 2, 1991, and purchased the same amount of cocaine at the same location. No arrests followed these purchases.
On August 17, 1991, the undercover officer contacted defendant to purchase three ounces of cocaine. Defendant told the undercover officer that he couldn't get it, but that he "knew somebody who supplied a lot in cocaine." The price discussed was $750 per ounce for a total of $2,250. Defendant indicated to the undercover officer that his friend would be coming with him to make the delivery. That night, co-defendant, Miguel Alvarez, met defendant at the Airport Plaza shopping center in Hazlet. Defendant and Alvarez then went in Alvarez's car to the Burger King to meet the undercover officer. Alvarez gave the cocaine to defendant who gave it to the officer. They were then placed under arrest.
It is evident from what transpired at the initial plea hearing that the assistant prosecutor had anticipated that defendant would testify that Alvarez was his supplier on the first two occasions on which defendant sold the cocaine to the undercover officer, as well as at the time of the final sale when defendant was arrested. The assistant prosecutor represented that defendant's counsel had, during negotiation of the plea agreement, represented that defendant told her Alvarez was the supplier on all three dates listed in the indictment. Therefore, when defendant did not testify in accordance with the prosecutor's expectations, the proceedings under the plea agreement were terminated by the judge.
A second judge, when denying defendant's formal motion to enforce the plea agreement of July 1, 1992, stated:
All right. Well, I decline to enforce a plea agreement which in fact is not a plea agreement at all. It is obvious that the plea agreement did not go through before [the plea judge.] On two other occasions counsel indicates that the Court declined to act on her arguments to enforce that plea agreement: One, at the plea cut off; and two, at the motion for a severance. I don't conceive that it is the Court's function to force the prosecutor to accept less than he expected back in July. And accordingly, I will not enforce that plea agreement.

[Emphasis added.]
*13 On August 11, 1993, the State filed a petition with the judge assigned to try the Alvarez case seeking immunity for Matos and to compel his testimony at the trial of Alvarez. The petition relates that defendant appeared before a Law Division judge during the course of a hearing on August 2, 1993, and advised the court that he intended to refuse to answer questions regarding the incidents for which co-defendant Alvarez was to be tried. A hearing was then held regarding this petition on August 19, 1993. The transcript from this hearing reflects that private counsel for co-defendant was in attendance, but does not indicate whether Alvarez were present. The State's brief on appeal states that "[c]odefendant Alvarez had been transported from the Hudson County Jail to the Superior Court." However, nothing in the record below demonstrates that Alvarez was present in the courtroom.
It is apparent from the dialogue at the hearing that the judge was in the middle of trying a murder case. He would not say whether the Alvarez case would proceed immediately thereafter. At this hearing, defendant's counsel sought to clarify whether defendant would be held in contempt the following week when she assumed Alvarez's trial would begin. The judge immediately responded: "I'm going to do it now." Defense counsel asked when the trial was to start and the judge replied, "When I get around to trying the case." Upon further questioning regarding the start of the trial, the judge answered that the decision to begin trial was to be determined on a "day-to-day" basis. In response to further prodding regarding when the Alvarez trial might start, the judge stated:
Maybe you are misunderstanding something. Perhaps this is what you are asking me, what's the procedure from here on in. I have no intention of picking a jury, sitting here and then waiting for him to come in and then express at that point whether he is going to testify or not, and then have a jury sit home or downstairs waiting for him to make a decision to change his mind.
The judge added that the case "is on the trial calendar right now, subject to the availability of a judge." Defense counsel then stated: "What happens typically is, as the Court well knows, *14 availability of witnesses, you know we have vacations, we have sickness, we have problems that could drag this case on for months and months and months."
The judge responded: "No. He is going to make his decision today. And he is going to make his decision now whether he wishes to testify in that trial ."
The judge then asked the defendant whether he "still wish[ed] not to testify." When he answered "yes sir," the judge entered an order compelling defendant to testify at the trial and adjudging him in contempt for refusing to testify.

I
Defendant and the State entered into a plea agreement, the terms of which stated that defendant would be pleading guilty to counts six, eleven, and thirteen of the indictment in exchange for his promise to testify truthfully at the trials of his co-defendants. The agreement, signed by the parties, also stated defendant would not be sentenced until after his co-defendants' trial. The agreement provides that
if there is a determination by the Court that this defendant has failed to comply with this plea agreement, this will be null and void; the modification of bail will be rescinded; and this will be returned to the trial list and this defendant will stand trial on this indictment in its entirety.
On July 1, 1991, the parties appeared in open court to have defendant enter his plea in accordance with the agreement. Pursuant to R. 3:9-2, the agreement was read into the record and defendant was placed under oath and questioned about it. Defendant answered "no" when asked if the person who supplied him with the cocaine on the third drug transaction with the undercover officer were his supplier in the previous two narcotic transactions. As indicated, the prosecutor had expected that defendant would testify that Alvarez was his supplier on all three occasions. Apparently, because of his belief that defendant was not complying with the plea agreement, the judge refused to accept defendant's *15 plea. This appeal is from the denial of defendant's motion to enforce this plea agreement.
Initially, the State argues that defendant's entire appeal of the plea bargain issue is procedurally barred pursuant to R. 3:9-3(f). In pertinent part, this rule provides:
With the approval of the court and the consent of the prosecuting attorney, a defendant may enter a conditional plea of guilty reserving on the record the right to appeal from the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be afforded the opportunity to withdraw his plea. Nothing in this rule shall be construed as limiting the right of appeal provided for in R. 3:5-7(d).

[R. 3:9-3(f) (emphasis added).]
The plea form that was utilized in the plea proceeding on November 10, 1992, contained a hand-written statement by defense counsel that defendant would "appeal the pre-trial motions." The State points out that the prosecuting attorney never signed this form. Thus, the State argues that because defendant never obtained the consent of the prosecutor pursuant to R. 3:9-3(f), this appeal of the order denying enforcement of the plea agreement is improper.
This assertion by the State is disingenuous. When defendant's guilty plea was accepted by the judge, the assistant prosecutor did not take exception to defense counsel's statement that there would be appeals made from the pretrial motions. In fact, the defense specifically asserted that the court's refusal to enforce the plea agreement was one of the pretrial motions that would be appealed. The judge took particular note that the plea agreement reserved defendant's right to appeal the pretrial motions. In these circumstances, we will not bar defendant's appeal on the grounds that the prosecutor did not sign the plea form.
We agree, however, that defendant is not entitled to specific performance of the plea agreement of July 1, 1992. We, therefore, affirm the denial of his motion to enforce the agreement and, hence, the judgment of conviction entered on his voluntary plea is also affirmed.
*16 "Plea bargaining has become firmly institutionalized in this State as a legitimate, respectable and pragmatic tool in the efficient and fair administration of criminal justice." State v. Taylor, 80 N.J. 353, 360-61, 403 A.2d 889 (1979) (citations omitted). Also, "[i]f plea bargaining is to fulfill its intended purpose, it must be conducted fairly on both sides and the results must not disappoint the reasonable expectations of either." State v. Thomas, 61 N.J. 314, 321, 294 A.2d 57 (1972).
"Once defendant's good faith compliance is established, the State must fulfill its part of the bargain and its failure to do so constitutes a per se bad faith prosecution." State v. Riley, 242 N.J. Super. 113, 119, 576 A.2d 39 (App.Div. 1990). In the present matter, there was either no good faith compliance on the part of defendant because of his untruthfulness or there was a mistaken representation by defense counsel as to the testimony that defendant would provide to the State. It is undisputed that at the aborted plea hearing on July 1, 1992, defendant did not testify as expected. Therefore, in either circumstance, the judge properly concluded the proceedings without accepting defendant's guilty plea.
The plea agreement stated that "if there is a determination by the Court that this defendant has failed to comply with this plea agreement, this will be null and void...." It was within the judge's discretion to conclude the proceedings without accepting defendant's guilty plea. See R. 3:9-3(c) and (e). We recognize that notions of fairness apply to both the State and the defendant, and that "the defendant's constitutional rights and interests weigh more heavily in the scale." State v. Warren, 115 N.J. 433, 443, 558 A.2d 1312 (1989). Nonetheless, the circumstances in the present matter do not warrant the enforcement of the plea agreement even on defendant's asserted ground that the State ultimately sought to use his testimony and benefitted from his disclosure of Alvarez's involvement which was otherwise unavailable for the State's proofs. Defendant's assertion of unfairness is clearly without merit. R. 2:11-3(e)(2).

*17 II
We agree with defendant's contention that "the trial court lacked the authority to hold him in contempt based upon his statement that he did not intend to comply with an order to testify at some time in the future." We conclude that the contempt order was invalid and direct that the period of time defendant was confined under the order be credited toward his sentence on the underlying indictment.
N.J.S.A. 2A:81-17.3 provides the requirements for ordering an individual in contempt when immunity has been given. In relevant part, it provides:

In any criminal proceeding before a court or grand jury, if a person refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby and if the Attorney General or the county prosecutor with the approval of the Attorney General, in writing, requests the court to order that person to answer the question or produce the evidence, the court shall so order and that person shall comply with the order.... If a person refuses to testify after being granted immunity from prosecution and after being ordered to testify as aforesaid, he may be adjudged in contempt and committed to the county jail until such time as he purges himself of contempt by testifying as ordered without regard to the expiration of the grand jury; provided, however, that if the grand jury before which he was ordered to testify has been dissolved, he may then purge himself by testifying before the court.

[N.J.S.A. 2A:81-17.3 (emphasis added).]
In legislation that was proposed before this statute was adopted, the language regarding when a party is held in contempt stated that the refusal to testify must occur "in the course of any criminal investigation or proceeding before a grand jury or any criminal trial...." S. 312, 192nd Leg. (1968); A. 165, 191st Leg. (1967); S. 34, 191st Leg. (1967); S. 231, 190th Leg. (1966); A. 31, 190th Leg. (1966); A. 357, 189th Leg. (1965). The language that was ultimately adopted reads "in any criminal proceeding before a court or grand jury...." N.J.S.A. 2A:81-17.3. This shows that the Legislature intended to make the statute applicable to "criminal proceedings" only.
Our decision in this case turns, in part, on whether the hearing of August 19, 1992, when defendant was adjudged in contempt, *18 constituted "criminal proceedings before a court or grand jury" as required by N.J.S.A. 2A:81-17.3. "There is, in our jurisprudence, no doctrine of `anticipatory contempt.'" United States v. Bryan, 339 U.S. 323, 341, 70 S.Ct. 724, 735, 94 L.Ed. 884, 896 (1950). This court has recognized that it is a "nettlesome issue" to determine whether a trial judge may hold a witness in civil contempt before the trial starts because the witness states an intention not to testify in the future at trial. State v. Dunns, 266 N.J. Super. 349, 374, 629 A.2d 922 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993). In Dunns, there was no need to resolve the issue, however, it was discussed in the context of the appropriate procedures for contempt as had been explained by the Sixth Circuit in United States v. Johnson, 736 F.2d 358, 360 (6th Cir.1984).
In Johnson, a defendant, Timothy Neal, was involved in a bank robbery with two co-defendants, Marlon and Bennie Johnson. Id. at 359. Neal agreed to plead guilty and testify against his co-defendants. Ibid. Initially, Neal abided by the agreement and testified against the Johnsons before a grand jury, resulting in the Johnsons being indicted. Ibid. When it came time for Neal to enter his guilty plea, he informed the court that he would not plead guilty. Ibid. He was subsequently tried, convicted, and sentenced. Ibid.
Before the Johnsons' trial, the government filed a motion to compel Neal's testimony, along with a motion for a grant of immunity. Ibid. At the hearing on these motions, Neal declared that he would not testify at his co-defendants' trial. Ibid. The judge held Neal in contempt and granted the government's motion to adjourn the Johnsons' trial for an indefinite period of time, ruling that Neal was an essential and unavailable witness. Id. at 360. Neal's incarceration for contempt did not count as jail credit for his bank robbery conviction. Ibid.
The Sixth Circuit stated that the issue was
whether a district court has the authority to hold a person who will be called as a witness in civil contempt before the trial starts, before the witness is called to testify, and before any present refusal to testify is made because that witness states an intention not to testify in the future.

[Ibid.]
*19 The Sixth Circuit initially noted that it found no case in which what is described as "anticipatory contempt" had been practiced or approved. Ibid. The Sixth Circuit then explained the usual procedure followed in these matters:
In what we would consider to be the normal procedure, the government would proceed to trial and call Neal as a witness. If Neal then refused to answer any questions, he could be adjudged in contempt and incarcerated until he agreed to testify or until the trial ended. The government finds this procedure less than satisfactory because jeopardy would, of course, attach after the trial had begun. Thus, if Neal persisted in his recalcitrance, the Johnsons would be immune from further prosecution.

[Id. at 360-61.]
It is significant to note that the applicable federal statute in Johnson, was broader in several respects than New Jersey's contempt statute. The federal statute, in relevant part, provides as follows:
(a) Wherever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, ... the court, upon such refusal or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as a witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of 
(1) The court proceeding, or
(2) The term of the grand jury, including extensions, before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

[28 U.S.C.A. § 1826.]
The Sixth Circuit found two insurmountable "problems" which prevented it from upholding the contempt order: 1) it was less than clear that a statement of intent not to comply in the future with an order to testify is a refusal; and 2) it was not clear that the refusal occurred during a proceeding. Johnson, supra, 736 F.2d at 361-62. These problems are more acute in the present case as our statute does not contain the broad language of the federal statute  "proceeding before or ancillary to any court or grand jury...." Further, the federal statute refers exclusively to refusal to comply with an order to testify or provide others *20 information, whereas, the New Jersey statute refers to "a person [who] refuses to answer a question or produce evidence" and also refers to requesting "the court to order that person to answer the question or produce evidence." N.J.S.A. 2A:81-17.3.
As the Sixth Circuit acknowledged, "[o]ne of the most fundamental principles of the law of contempt is that a court must exercise only the `least possible power adequate to the end proposed.'" Johnson, supra, 736 F.2d at 362 (quoting Shillitani v. United States, 384 U.S. 364, 371, 86 S.Ct. 1531, 1536, 16 L.Ed.2d 622 (1966); In re Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 79, 90 L.Ed. 30 (1945); Anderson v. Dunn, 19 U.S. (6 Wheat.) 204, 230, 5 L.Ed. 242 (1821)). The Sixth Circuit concluded that "anticipatory contempt" was a greater exercise of power than necessary under the normal procedure for delivery with such matters. Johnson, supra, 736 F.2d at 363. Also, the court found that imposing contempt only at trial and after an actual refusal was an adequate procedure. Ibid. Therefore, the Sixth Circuit held that "anticipatory contempt" is improper under traditional notions of the law of contempt. Id. at 365.
While the Sixth Circuit found no precedent directly on point, it noted that there was support for its decision contained in dicta or indirectly in case law. See United States v. Bryan, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950) (stating that an intention not to comply with a subpoena requiring presence before a committee of Congress would not result in contempt); see also Harris v. United States, 382 U.S. 162, 86 S.Ct. 352, 15 L.Ed.2d 240 (1965).
The State claims that August 19, 1993, the date defendant was held in contempt, was the scheduled date for co-defendant Alvarez's trial. It is, however, apparent that Alvarez's trial could not begin at that time. The judge stated that trial was to begin "when [he] got around to trying the case," and that the decision to begin trial was to be determined on a "day-to-day" basis. Clearly, the hearing was held solely for the purpose of determining whether defendant were going to testify at Alvarez's trial sometime in the future. This hearing did not fall within the statutory requirement *21 of a "criminal proceeding," nor does it fit within the conduct to be punished, i.e. refusal "to answer a question or produce evidence." N.J.S.A. 2A:81-17.3.
As noted in Johnson, supra, if defendant had agreed to testify instead of being placed in "anticipatory contempt," there would have been no guarantee for the prosecution that defendant would not change his mind by the time Alvarez's trial began. If "anticipatory contempt" orders are to be the practice, defendants will no doubt soon learn to state that they will testify, but then change their minds when on the witness stand. In this way, they will avoid losing credit for jail time imposed under contempt orders before a trial.
The Supreme Court of Ohio has held:
Where a trial court has not adjudged parties to be in contempt for their past conduct, and where the time for the court-ordered performance of a certain act has not yet arrived, a trial court's order of incarceration is premature and is not sustainable upon a theory of prospective contempt.
[Board of Educ. of the Brunswick City School District v. Brunswick Educ. Assoc., 61 Ohio St.2d 290, 401 N.E.2d 440, 444 (1980); see also In re Contempt of Dougherty, 429 Mich. 81, 413 N.W.2d 392, 402 (1987).]
In Brunswick, supra, a Board of Education brought an action to halt a teachers' strike, and sought a restraining order against the Education Association seeking to enjoin it from striking and from picketing. 401 N.E.2d at 441. The trial court granted the motion, but it reserved a limited right of picketing to the teachers. Ibid. The following day, the Board filed charges in contempt alleging violations of the restraining order. Ibid. At the hearing on the contempt charges, the judge asked all the defendants whether they intended to obey the restraining order in the future. Id. 401 N.E.2d at 442. The judge further advised the defendants that if they said, "no," they would be sent to jail. Ibid. The defendants' counsel objected to this procedure, but the defendant-teachers who stated their intent to disobey the order were immediately ordered incarcerated and fined prospectively $500 per day. Ibid.
The Ohio Court of Appeals affirmed the incarceration, but reversed the portion of the trial court's order that levied a *22 prospective fine. Ibid. The Ohio Supreme Court reversed the order of incarceration and affirmed the portion of the decision which reversed the order assessing prospective fines. Id. 401 N.E.2d at 444 and 445. The Ohio Supreme Court reasoned:
It is a fundamental principle of our legal system that a person should not be incarcerated for the mere intention to commit an unlawful act. In the typical civil contempt case, the individual is ordered to perform an act, and if he refuses at a time when performance is due, his refusal is itself a contumacious act, and he may be imprisoned until he agrees to purge the contempt. See, e.g., Shillitani v. United States (1966), 384, U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622. The refusal to perform an act ordered by the court, at a time when the obligation to perform has matured, concretely demonstrates the contemnor's willingness to defy the law, and justifies his incarceration.
Where, however, the time for performance has not arrived, the intention not to perform is not an act in defiance of the court order; it remains, in legal effect, a state of mind. One may perform at the time performance is judicially mandated, notwithstanding a previous statement to the contrary.

[Id. 401 N.E.2d at 443-44.]
We find this reasoning helpful here even though the factual circumstances in Brunswick are different. In the present matter, defendant stated his intention not to testify at an indefinite time in the future at the trial of Alvarez. Defendant should not have been adjudged guilty of contempt in anticipation of his future refusal "to answer a question" not yet formulated or asked of him. The trial court lacked the authority to hold defendant in contempt of court in advance of co-defendant's trial. N.J.S.A. 2A:81-17.3 requires that there be a "criminal proceeding before a court or grand jury," and that a person refuse "to answer a question." Therefore, defendant should be given jail credit for the period of time that he was incarcerated under the contempt order (from August 19, 1993 to September 30, 1993).
If the procedures for contempt under the present statute are felt to be insufficient to meet present day needs, then the Legislature should act, after consideration of the various rights and needs of all involved, to extend the Court's power to its broadest constitutional limits.
The judgment of the conviction is affirmed except to the extent that defendant's contempt is set aside and he is to be allowed the jail credits set forth above.
*23 Appeal No. A-3626-92T4 is affirmed.
Appeal No. A-6547-92T4 is reversed.
NOTES
[1] The transcript of this proceeding is captioned State v. Angel Matos and notes the appearances of the Assistant County Prosecutor and Matos' defense counsel on its cover.