744 A.2d 699 (2000)
328 N.J. Super. 77
STATE of New Jersey, Plaintiff-Appellant,
v.
Andres TORRES, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued January 26, 2000.
Decided February 10, 2000.
*700 Kenneth P. Ply, Assistant Essex County Prosecutor, for plaintiff-appellant (Donald Campolo, Acting Prosecutor, attorney; Mr. Ply, of counsel and on the brief).
Mordecai Garelick, Assistant Deputy Public Defender, for defendant-respondent (Ivelisse Torres, Public Defender, attorney; Mr. Garelick, of counsel and on the brief).
Before Judges BAIME, BROCHIN and BILDER.
The opinion of the court was delivered by BAIME, P.J.A.D.
This case presents questions concerning the reach of the Federal and State prohibitions against double jeopardy. Three *701 Newark taxicab drivers were murdered within a two week period. The police investigation resulted in the arrest of defendant, Roger Hoyte and Larry Mayo. Hoyte, who confessed and pointed to defendant as one of the participants in the homicides, pled guilty to three counts of capital murder and was sentenced to an aggregate term of life imprisonment with a ninety year parole disqualifier when the jury did not return a death verdict. Defendant was brought to trial while Hoyte's appeal was pending. In his opening statement, the assistant prosecutor indicated that Hoyte would appear as a State's witness and implicate defendant in the killings. The trial court granted defendant's motion for a mistrial when Hoyte refused to testify after being granted immunity. The indictment was dismissed and retrial barred upon the court's finding that the prosecutor could not reasonably have expected that Hoyte would appear as a prosecution witness. The State appeals. We reverse.

I.
We do not recount the facts at length. Between October 21 and November 8, 1995, three Newark taxicab drivers were murdered. The crimes had all of the earmarks of having been committed by a serial killer. In all three cases, the victim was shot at point-blank range with the same.22 caliber handgun. Curiously, each victim's shoes were missing when the body was discovered. The execution-style killings were widely reported by the media.
The homicides remained unsolved until November 16, 1995, when Tamika McGriff telephoned the Essex County Sheriff's Crimestoppers number and indicated that she knew the identity of the killers. In a subsequent interview with members of the prosecutor's homicide squad, McGriff related several incriminating statements made by Hoyte and defendant the previous evening while the three were watching a television news broadcast. When the commentator referred to the "serial killings," Hoyte exclaimed, "[t]hat's probably us" and "[w]e made the news." The news report alluded to the suspicion that some sort of bizarre ritual was involved because of the missing shoes, prompting Hoyte to note, "[w]e took the boots off because of [finger]prints." Hoyte described how defendant had dragged the drivers out of the taxicabs by their feet because "they couldn't be driving around with a dead body in the car..." Hoyte explained that they removed the shoes from the victims so that the police could not trace their fingerprints. At that point, defendant angrily interrupted Hoyte's vivid description of the crimes, ordering him to "shut up" because "everybody's business ain't nobody's."
McGriff also recounted prior inculpatory statements made by defendant. After the second killing, Hoyte asked McGriff for her shoe size, exhibiting a pair of boots. According to McGriff, defendant remonstrated Hoyte, "[d]on't give her the boots of no dead man." Shortly after the third homicide, defendant confided to McGriff that Hoyte had "caught a body, had earned his stripes." When McGriff asked what defendant meant, he responded that Hoyte had killed a taxicab driver. McGriff also alluded to a prior incident in which defendant and Hoyte were "playing with" a gun, "tossing ... it back and forth." At trial, McGriff identified the murder weapon, which had been discovered after the arrests, as "looking like" the gun she had seen in the possession of Hoyte and defendant.
Following their interview with McGriff, the prosecutor's office obtained a warrant to search defendant's residence. An identification card belonging to the first murder victim was found in a leather portfolio in defendant's bedroom. Defendant was arrested shortly thereafter.
Defendant gave a lengthy inculpatory statement after being apprised of his constitutional rights. In his statement, defendant admitted that he was present when the three homicides were committed. Although *702 defendant's version of the killings tended to minimize the extent of his involvement, he nevertheless conceded that he assisted in disposing the victims' bodies and he shared in the proceeds of the robberies.
It is undisputed that defendant and Hoyte sold the murder weapon two days after the third murder. Derrick Hunter, a Newark firefighter, testified that he purchased the gun from defendant and Hoyte for fifty dollars. Hunter subsequently notified police and turned the gun over to the authorities. At the police station, Hunter identified defendant and Hoyte as the individuals who had sold him the gun.
The Essex County grand jury returned a multi-count indictment charging defendant, Hoyte and Mayo with a variety of crimes relating to the three homicides. Among other offenses, Hoyte was individually charged with the capital murders of all three victims. Defendant was charged with three counts of purposeful or knowing murder and related crimes. Mayo was charged with participating in only two of the three murders.
Because all of the defendants gave confessions detailing their complicity and that of their confederates in the murders, their cases were severed. Mayo eventually pled guilty to two counts of purposeful or knowing murder and was sentenced to thirty years imprisonment without parole. Hoyte initially challenged the admissibility of his confession. At the hearing, however, Hoyte testified that his twelve-page statement was accurate in every detail and that he and defendant committed all three murders. In negotiations with the prosecutor's office, Hoyte offered to cooperate in return for a prison term. The prosecutor's office rejected that offer. Hoyte ultimately pled guilty to the entire indictment, including the counts charging him with capital murder. In giving his factual basis for the plea, Hoyte described the defendant's and Hoyte's involvement in some detail. The jury refused to impose the death penalty. Hoyte was sentenced to life imprisonment with ninety years parole ineligibility. Following imposition of sentence, Hoyte filed an appeal challenging the denial of his motion to suppress his confession. That appeal remained pending.
The stage was set for defendant's trial. Prior to jury selection, the assistant prosecutor, who had just completed the Hoyte prosecution, met with Hoyte's attorney. In the course of their discussion, the assistant prosecutor alerted Hoyte's lawyer that he intended to call Hoyte as a witness and obtain a grant of immunity. The assistant prosecutor asked what Hoyte would do. The attorney responded that he had previously discussed with Hoyte the possibility that Hoyte would be called as a State's witness, but he did not know how Hoyte would react.
In the course of his opening statement, the assistant prosecutor told the jury that Hoyte would be called as a State's witness. The assistant prosecutor noted that Hoyte had pled guilty to all three capital murders and had been sentenced to life imprisonment with ninety years parole ineligibility. The assistant prosecutor emphasized that there had been no plea agreement, but that Hoyte would be compelled to testify because he would be granted use immunity. It was said that Hoyte would thus have no motive to lie, and that he would provide detailed testimony concerning the extent of defendant's involvement. Although defense counsel did not interpose an objection, he moved for a mistrial following the assistant prosecutor's opening statement, contending that the prejudice to defendant would be ineradicable in the event Hoyte refused to testify. The trial court denied defendant's motion and the trial proceeded.
We think it fair to note that the State's case against defendant was overwhelming. Even had the jury rejected the State's theory that defendant was a willing accomplice to the murders, the evidence irrefutably established his active participation in *703 the three felony murders. However, the trial was aborted when Hoyte refused to testify after asserting his Fifth Amendment privilege out of the presence of the jury and being granted immunity. The assistant prosecutor implored the trial court to allow the trial to proceed, noting his intention to present evidence indicating that Hoyte and defendant had been housed in adjacent cells to show that defendant must have prevailed upon Hoyte not to testify. The trial court ordered a mistrial at defendant's behest because the mark left by the assistant prosecutor in his opening statement was indelible and could not be eradicated by a curative instruction. In an oral decision, the court noted that the assistant prosecutor's representation that he expected Hoyte to testify lacked the "ring of truth."
The case was transferred to a different judge. Defendant moved to dismiss the indictment. In his opposing affidavit, the assistant prosecutor described his reason for believing Hoyte would testify. The assistant prosecutor noted that Hoyte had not been reticent in accepting blame for the killings and describing defendant's involvement. Hoyte had volunteered this information in his confession, his testimony during the motion to suppress, and his factual basis for his pleas of guilty to capital murder. The assistant prosecutor emphasized that he had not spoken directly to Hoyte because of the pending appeal, but that Hoyte's lawyer never told him that his client would not testify. The trial court was not persuaded and granted defendant's motion on the ground of double jeopardy and fundamental fairness. The court made no finding concerning whether the assistant prosecutor had acted in bad faith. The court concluded instead that it was unreasonable for the assistant prosecutor to have expected that Hoyte would testify. The court stressed that Hoyte was under a stiff sentence and would have been subject to retribution had he appeared as a State's witness. The court found that the assistant prosecutor's opening statement had made a mistrial "inevitable" and that his misconduct had "goaded" defendant to request that the trial be aborted.

II.
We begin with the Federal Constitution's prohibition against double jeopardy. The Fifth Amendment's double jeopardy clause protects a defendant from repeated prosecutions for the same offense. North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664-65 (1969), rev'd on other grounds, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). The bedrock principle is that the State, with all its resources and power, should not be allowed to make repeated attempts to convict an individual, thus compelling him to live in a continuing state of anxiety and insecurity. Green v. United States, 355 U.S. 184, 187-88, 78 S.Ct. 221, 223-24, 2 L.Ed.2d 199, 204 (1957). As part of this protection, the double jeopardy clause affords a defendant a "valued right to have his trial completed by a particular tribunal." Wade v. Hunter, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974, 978 (1949). Even if the first trial is not completed, a second prosecution may be grossly unfair. United States v. McKoy, 591 F.2d 218, 222 (3d Cir.1979). Repeated prosecutions increase the accused's financial burden, prolong the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted. Consequently, the State is generally entitled to one, and only one, opportunity to require an accused to stand trial. Arizona v. Washington, 434 U.S. 497, 503-05, 98 S.Ct. 824, 829, 54 L.Ed.2d 717, 727-28 (1978).
Weighed against these concerns is the right of the public to the fair and vigilant enforcement of the criminal laws. The first right of the individual is to be protected from criminal attack, as the preamble to the Federal Constitution *704 plainly says. State v. Bisaccia, 58 N.J. 586, 590, 279 A.2d 675 (1971). To set free criminal suspects whenever a trial is aborted would deny the innocent the protection due them and defeat the social contract upon which government is based. Where the trial is terminated, over the objection of the defendant, because of manifest necessity, a second proceeding is constitutionally permissible. The manifest necessity standard provides sufficient protection to the defendant's right in having his case decided by the jury first selected while maintaining the public's interest in fair trials designed to conclude in just judgments. Wade v. Hunter, 336 U.S. at 689, 69 S.Ct. at 837, 93 L.Ed. at 978.
Where a mistrial is declared at the behest of the defendant, however, different considerations come into play. In such a case, the defendant himself has elected to terminate the proceedings. To that extent, the decision to abort the trial is within his power and control. His decision to terminate the proceedings may be viewed as a renunciation of his right to have the trial completed before the first jury empaneled. The problem with such a view is that an errant prosecutor, sensing that completion of the trial will result in an acquittal, may purposely "goad the [defendant] into requesting a mistrial." United States v. Dinitz, 424 U.S. 600, 611, 96 S.Ct. 1075, 1081, 47 L.Ed.2d 267, 276 (1976). Since an acquittal would bar a retrial, it is only fair that in such a situation the same result should attach to a mistrial deliberately provoked by the prosecutor. In such a case, the defendant's valued right to complete his trial before the first jury would be a hollow shell if a mistrial provoked by the prosecutor would not invoke the double jeopardy prohibition. And surely, a prosecutor who has deliberately provoked a mistrial in order to avoid an acquittal has had his day in court and cannot complain.
In United States v. Dinitz, 424 U.S. at 611, 96 S.Ct. at 1081, 47 L.Ed.2d at 276, the United States Supreme Court said as much. Specifically, the Court concluded that the double jeopardy clause "protect[s] a defendant against governmental actions intended to provoke mistrial requests," thereby subjecting defendants "to the substantial burdens imposed by multiple prosecutions." Ibid. However, the Court went on to say that "bad faith conduct by judge or prosecutor ... threatens the `[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict.'" Ibid. (quoting Downum v. United States, 372 U.S. 734, 736, 83 S.Ct. 1033, 1034, 10 L.Ed.2d 100, 102 (1963)). That language appeared to broaden the reach of the double jeopardy clause to bar a retrial where the prosecutor's bad faith conduct resulted in a mistrial.
The apparent implication of the language was addressed in Oregon v. Kennedy, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The Oregon Court of Appeals decided that the double jeopardy clause barred the defendant's retrial after the first trial ended in a mistrial granted on his own motion. The Oregon court reasoned that a retrial was precluded because the prosecutorial misconduct that occasioned the mistrial in the first instance amounted to overreaching. The United States Supreme Court reversed. Writing for the majority, Chief Justice Rehnquist stressed that a criterion based upon prosecutorial "overreaching" or "bad faith" offered "virtually no standard [ ] for [its] application." Id. at 674, 102 S.Ct. at 2089, 72 L.Ed.2d at 424. Noting that resolution of double jeopardy questions by state trial courts are reviewable not only within the state court system but in the federal court system on habeas corpus as well, the Court emphasized the desirability of "an easily applied principle." Id. at 675, 102 S.Ct. at 2089, 72 L.Ed.2d at 424. The Court reasoned that where prosecutorial error even of a degree sufficient to warrant a mistrial has occurred, the important consideration for double jeopardy purposes *705 is that the defendant retain primary control over the course to be followed. Id. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 425. A defendant's motion for a mistrial even when occasioned by prosecutorial bad faith was said to constitute a deliberate election on his part to forego his valued right to have his guilt or innocence determined before the first trier of fact. Ibid. The Court thus held that "[p]rosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, ... does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause." Id. at 675-76, 102 S.Ct. at 2089, 72 L.Ed.2d at 424. "Only where the governmental conduct in question is intended to `goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." Ibid.
In separate concurring opinions, Justices Powell and Stevens provided factors for determining whether or not a prosecutor's misconduct was intended to provoke a mistrial. Noting that subjective intent often may be unknowable, Justice Powell emphasized that "a courtin considering a double jeopardy motionshould rely primarily upon the objective facts and circumstances of the particular case." Id. at 680, 102 S.Ct. at 2092, 72 L.Ed.2d at 427 (Powell, J., concurring). Specifically, the court should consider: (1) whether there was a sequence of overreaching or error prior to the error resulting in the mistrial, (2) whether the prosecutor resisted the motion for a mistrial, (3) whether the prosecutor testified, and the court below found, that there was no intent to cause a mistrial, and (4) the timing of the error. Ibid.
Applying these standards, we find nothing in the record to support the conclusion that the assistant prosecutor intentionally goaded defendant into requesting a mistrial. First, the record does not disclose a pattern of prosecutorial error. Second, the prosecutor argued vociferously against granting defendant's motion for a mistrial. Third, although both the trial judge and the judge who granted defendant's motion to dismiss the indictment found that the prosecutor did not have reasonable expectations that Hoyte would testify, neither judge found that the prosecutor intended to provoke a mistrial and the prosecutor certified that he expected Hoyte to testify. Fourth, the error was made in the assistant prosecutor's opening statement before any evidence had been offered or admitted, prior to the point in which success or failure in the prosecution of the defendant could reasonably have been assessed.
Wholly apart from these circumstances, nothing in the record suggests a motive for provoking a mistrial. The State's case was formidable. The prosecution's evidence was introduced without a hitch. We can discern no earthly reason why the assistant prosecutor would want to abort the proceedings. We stress that neither of the judges below found specifically that the assistant prosecutor deliberately goaded the defense into seeking a mistrial. But even had such a finding been made, it could not fairly be argued that the evidence supported this conclusion. The objective evidence abounds the other way. We thus conclude that federal constitutional standards do not bar a retrial.

III.
Defendant nevertheless argues that our State Constitution and the doctrine of fundamental fairness require dismissal of the indictment. He offers the following factual scenario to support his claim. Defendant argues that the assistant prosecutor, a veteran trial attorney of over twenty years, deliberately suffered error in his opening statement in order to achieve an unfair tactical advantage. By offering more than he could deliver, the assistant prosecutor envisioned several possible outcomes, all acceptable to him. Either the trial would proceed to verdict, with the *706 missing ingredients of the State's case illicitly planted in the jurors' minds by reason of the opening statement, or the proceedings would end in a mistrial once the absence of Hoyte became manifest, leaving the prosecution in no worse a position than it was at the start. Defendant argues that New Jersey's Constitution and the judiciary's corollary duty to seek fundamental justice mandate dismissal of the indictment even if federal Fifth Amendment principles do not provide similar protection.
We do not discount the possibility that the assistant prosecutor sought tactical advantage in placing before the jury allegations that he knew he could not prove. Read indulgently, that is the thrust of the findings made by both the trial judge and the judge who dismissed the indictment. The question then is whether the State Constitution or the doctrine of fundamental fairness bars a retrial when the first trial was aborted at the behest of the defendant by reason of such egregious prosecutorial misconduct.
We first conclude that the New Jersey Constitution provides no greater protection than its federal counterpart. We, of course, owe no duty to march in lock-step with the federal Supreme Court when construing the protections afforded by our Constitution. See, e.g., New Jersey Coalition Against War in the Middle East v. J.M.B. Realty Corp., 138 N.J. 326, 650 A.2d 757 (1994), cert. denied, 516 U.S. 812, 116 S.Ct. 62, 133 L.Ed.2d 25 (1995) (expanding the First Amendment to the New Jersey Constitution to require regional shopping centers to permit distribution of leaflets on societal issues); State v. Tucker, 136 N.J. 158, 642 A.2d 401 (1994) (extending the New Jersey constitutional protections to prohibit seizure of items dropped by a suspect fleeing from a police officer who did not have the right to forcefully detain him); State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990) (enlarging the New Jersey constitutional protections of an individual's expectation of privacy to include garbage cans left for collection); State v. Hunt, 91 N.J. 338, 450 A.2d 952 (1982) (extending the Search and Seizure safeguard of the New Jersey Constitution beyond the Federal Constitution to protect an individual's expectation of privacy in toll billing records held by a telephone company); State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981) (expanding the New Jersey Constitution to provide standing to passengers to object to automobile searches); State v. Schmid, 84 N.J. 535, 423 A.2d 615 (1980) (extending the right of free speech under the New Jersey Constitution to protect against unreasonably restrictive and oppressive conduct by private entities); State v. Johnson, 68 N.J. 349, 346 A.2d 66 (1975) (establishing that State has the burden of showing that consent to a search was voluntary under the New Jersey Constitution). We nevertheless find no sound reason to conclude that New Jersey's double jeopardy prohibition has greater reach than the federal Fifth Amendment. There is no room for debate in light of New Jersey's constitutional history.
Unlike the broader double jeopardy language of the Fifth Amendment, our Constitution provides that no person shall, after acquittal, be tried for the same offense. N.J. Const. art. I, ¶ 11. That provision was not in the Constitution of 1776. It first appeared in the Constitution of 1844. N.J. Const. of 1844 art. I, ¶ 11. The history of the 1844 constitutional convention discloses that the use of the more limited phraseology was intended to insure that a defendant is not entitled to immunity from a second trial where his first trial ends, not in an acquittal, "but in jury disagreement or other indecisive disposition." State v. Currie, 41 N.J. 531, 536, 197 A.2d 678 (1964); see also State v. Roller, 29 N.J. 339, 344, 149 A.2d 238 (1959); City of Newark v. Pulverman, 12 N.J. 105, 110, 95 A.2d 889 (1953).
Our State constitutional prohibition against double jeopardy is thus coextensive with its federal counterpart. See State v. Roth, 95 N.J. 334, 344, 471 A.2d *707 370 (1984); State v. Barnes, 84 N.J. 362, 370, 420 A.2d 303 (1980); State v. Rechtschaffer, 70 N.J. 395, 404, 360 A.2d 362 (1976); State v. Cooper, 307 N.J.Super. 196, 201, 704 A.2d 947 (App.Div.1997); State v. Dunns, 266 N.J.Super. 349, 361, 629 A.2d 922 (App.Div.), certif. denied, 134 N.J. 567, 636 A.2d 524 (1993); State v. D'Amato, 218 N.J.Super. 595, 602 n. 1, 528 A.2d 928 (App.Div.1987), certif. denied, 110 N.J. 170, 540 A.2d 169 (1988); State v. De Marco, 211 N.J.Super. 421, 423-25, 511 A.2d 1251 (App.Div.1986). Our Supreme Court has stated that retrial is not barred when a case is mistried pursuant to a defendant's motion except "`where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial State v. Gallegan, 117 N.J. 345, 358, 567 A.2d 204 (1989) (quoting Oregon v. Kennedy, 456 U.S. at 676, 102 S.Ct. at 2089, 72 L.Ed.2d at 425). While we acknowledge that several states have adopted less rigorous standards based upon their constitutions, see Pool v. Superior Court, 139 Ariz. 98, 677 P.2d 261 (1984) (barring retrial if mistrial is granted because of prosecutor's intentional improper acts which cause irreparable prejudice to defendant); State v. Rogan, 91 Hawai`i 405, 984 P.2d 1231 (1999) (barring retrial based on egregious prosecutorial misconduct); People v. Dawson, 154 Mich.App. 260, 397 N.W.2d 277 (1986), aff'd 431 Mich. 234, 427 N.W.2d 886 (1988) (barring retrial if mistrial is granted because of prosecutor's intentional improper acts which cause irreparable prejudice to defendant); State v. Breit, 122 N.M. 655, 930 P.2d 792 (1996) (barring retrial if prosecutor knows that the conduct is improper and acts in willful disregard of a resulting mistrial); State v. White, 85 N.C.App. 81, 354 S.E.2d 324 (1987), aff'd, 322 N.C. 506, 369 S.E.2d 813 (1988) (barring retrial if egregious prosecutorial misconduct has rendered defendant no choice but to move for a mistrial); Oregon v. Kennedy, 295 Or. 260, 666 P.2d 1316 (1983) (barring retrial if prosecutor knows the conduct is improper and either intends or is indifferent to a resulting mistrial); Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992) (extending the bar to retrial if prosecutor intentionally acts to prejudice defendant to deny a fair trial); Bauder v. Texas, 921 S.W.2d 696 (Tex. Crim.App.1996) (barring retrial where "prosecutor was aware but consciously disregarded the risk" of retrial), we have no freedom to do so here.
Nor does the doctrine of fundamental justice require a different result. We recognize that "[t]he judicial article reposes in our courts the power to create, mold and apply remedies once jurisdiction is invoked." State v. Abbati, 99 N.J. 418, 428, 493 A.2d 513 (1985). "The court's power to fashion remedies in the realm of criminal justice is unquestioned." State v. Carter, 64 N.J. 382, 392, 316 A.2d 449 (1974), rev'd on other grounds, State v. Krol, 68 N.J. 236, 344 A.2d 289 (1975). Our Supreme Court has applied the doctrine to address governmental action that "`is constitutional but that, nonetheless, includes elements of oppression or harassment requiring court instruction.'" State v. Black, 153 N.J. 438, 455, 710 A.2d 428 (1998) (quoting State v. P.Z., 152 N.J. 86, 117, 703 A.2d 901 (1997)); see also State v. McCrary, 97 N.J. 132, 139-40, 478 A.2d 339 (1984); State v. Gaffey, 92 N.J. 374, 383-84, 456 A.2d 511 (1983); State v. Leonardis, 73 N.J. 360, 369, 375 A.2d 607 (1977); Adamo v. McCorkle, 13 N.J. 561, 563-64, 100 A.2d 674 (1953), cert. denied, 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1080 (1954). The courts' inherent powers have been exercised to dismiss indictments in several instances. See, e.g., State v. Laganella, 144 N.J.Super. 268, 365 A.2d 224 (App.Div.), appeal dismissed, 74 N.J. 256, 377 A.2d 652 (1976); State v. Hart, 139 N.J.Super. 565, 354 A.2d 679 (App.Div. 1976).
We do not believe that the doctrine of fundamental justice bars a retrial in this case. It is arguable that whether a prosecutor deliberately pursues an improper course of conduct because he means to goad a defendant into demanding a mistrial *708 or because he is willing to accept a mistrial and start over is a distinction without a difference. In our view, however, a bar against reprosecution must be derived from the constitutional objective to protect defendants against the harassment, embarrassment and risk of repeated criminal trials. It is not a sanction to be applied for the punishment of prosecutorial or judicial error. If the rule were otherwise, every reversal of a conviction on appeal would require a searching inquiry into the motive of the trial prosecutor or judge to see whether punishment is warranted by denying a retrial. So too, judges would be understandably reluctant to grant mistrials for fear that a vicious criminal would be set free. Justice is blind. But judges cannot appear to ignore the consequences of their decisions.

IV.
That leads us to an old topicone upon which reasonable persons can and do differ. Simply phrased, the question is whether the public should suffer because of a prosecutor's dereliction. We must be conscious of the consequences of a dismissal of an indictment with prejudice. The purpose of our system of criminal justice is to protect the innocent and punish the guilty. When a criminal trial is barred without reference to the evidence and a potential criminal is set free, the pain of such preclusion is felt, not by the inanimate State, or by some penitent assistant prosecutor, but by the offender's next victim. In such a way, the innocent are denied the protection due them by our Constitution.
There are better ways to punish a blundering or evil prosecutor. A prosecutor is first and foremost an attorneyan officer of the court. When he departs from his ethical and professional obligations, he is subject to discipline, including disbarment, suspension or reprimand. State v. Frost, 158 N.J. 76, 89, 727 A.2d 1 (1999). But prosecutors have ethical obligations beyond those of other attorneys. R.P.C. 3.8 (special responsibilities of prosecutor). A prosecutor is not simply another lawyer who happens to represent the State. Because of the overwhelming power vested in his office, his obligation to play fair is every bit as compelling as his responsibility to protect the public.
We are not clairvoyant. We do not know whether the prosecutor deliberately acted in bad faith in his zeal to obtain a conviction or whether his conduct of the trial rested on less sinister motives. We stress, however, that the prosecutor could have obviated the risk of causing prejudice to the defendant by seeking a hearing in advance of trial to inquire whether Hoyte would invoke his Fifth Amendment privilege and, if so, whether he would testify as a State's witness after having been granted immunity. See, e.g. State v. Williams, 59 N.J. 493, 284 A.2d 172 (1971); State v. Fournier, 91 N.J.Super. 477, 221 A.2d 225 (App.Div.1966). We do not read State v. Matos, 273 N.J.Super. 6, 640 A.2d 1176 (App.Div.1994) as requiring a different conclusion. That case merely holds that a witness's untested statement that he does not intend to comply with an order to testify in the future could not be the subject of a contempt citation. Id. at 17, 640 A.2d 1176. The assistant prosecutor thus had at his disposal methods by which Hoyte's intent could be tested, thereby obviating the danger of causing undue prejudice to the defendant. Beyond this, the assistant prosecutor's detailed prediction concerning Hoyte's prospective testimony cannot be condoned. A prosecutor's opening statement should provide an outline or roadmap of the State's case. It should be limited to a general recital of what the State expects, in good faith, to prove by competent evidence. State v. Hipplewith, 33 N.J. 300, 309, 164 A.2d 481 (1960); State v. Ernst, 32 N.J. 567, 577, 161 A.2d 511 (1960), cert. denied, 364 U.S. 943, 81 S.Ct. 464, 5 L.Ed.2d 374 (1961); State v. W.L., 292 N.J.Super. 100, 108, 678 A.2d 312 (App. Div.1996). At best, the assistant prosecutor *709 acted in a foolhardy fashion. At worst, he acted with an evil intent to prejudice defendant's right to a fair trial.
One point cannot fairly be debated. The assistant prosecutor acted in a manner entirely heedless of the risk of causing ineradicable prejudice to the accused. This conduct was wholly at odds with the assistant prosecutor's overriding duty to seek justice.
The Criminal Justice Act of 1970 provides that the Attorney General is the "chief law enforcement officer of the State." N.J.S.A. 52:17B-98. One of the most important duties of the Attorney General is to "maintain a general supervision over ... county prosecutors with a view to obtaining effective and uniform enforcement of the criminal laws." N.J.S.A. 52:17B-103.
The public thus looks to the Attorney General when law enforcement runs amuck. So do we. We commend this matter to the Attorney General to afford him an opportunity to take appropriate curative action. See State v. Frost, 158 N.J. 76, 89, 727 A.2d 1 (1999).
Reversed and remanded for trial.