**Lou G. PRICE, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below, Appellee.**

No. 486,2003.

Supreme Court of Delaware.

Submitted: July 21, 2004.
Decided: Sept. 8, 2004.

Joseph M. Bernstein (argued) and Andrew J. Witherell, Wilmington, for appellant.

Timothy J. Donovan, Jr. (argued), Natalie S. Woloshin, and James V. Apostolico, Department of Justice, Wilmington, for appellee.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS, Justices and LAMB, Vice Chancellor.*

---

* Sitting by designation pursuant to Del. Const. Art. IV § 12.

STEELE, Chief Justice:

A Superior Court jury convicted Leon Price of First Degree Murder and Possession of a Firearm During the Commission of a Felony. The trial judge sentenced him to life imprisonment without probation or parole on the murder conviction, plus an additional twenty years for the weapons offense. In this appeal from his conviction, Price contends that the prosecutor in her closing argument argued that the evidence supported a conviction on a theory of accomplice liability despite the fact that the trial judge had ruled that the evidence did not support accomplice liability and had accordingly refused the State's request for a jury instruction on the subject.

After a review of the evidence and consideration of the applicable law, we affirm the conviction. Despite her troubling tactics, the prosecutor's inappropriate remarks did not, in light of substantial evidence of guilt and the trial court's curative instruction, create reasonable doubt about the fairness of Price's trial. Notwithstanding our conclusion that we must affirm the conviction, after careful review of the trial transcript and, after considering widely accepted standards of prosecutorial conduct, we find that the prosecutor's actions here conflicted with her responsibilities under the ABA Standards of Conduct. We, therefore, strongly suggest that the Attorney General take appropriate action to address this deficiency.

## I.

Leon Price led a drug distribution ring operating between New York City and West Chester, Pennsylvania. Jamel Daniels was one of Price's principal cohorts. A Grand Jury indicted both Daniels and Price for the murder of Kensworth Griffith, a local drug dealer.[1] For several

1. The Superior Court severed Price and Daniels' cases for trial. Daniel's appeal, No. 506, 2003, is pending before this Court.

weeks before his murder, Griffith avoided contact with Price because he owed him "serious money" for drugs he had sold on Price's behalf. On the day of the shooting, Griffith, Daniels and two other drug dealers, Jose Martinez and Jamik Mosley, met Price at a gas station. All five drove around together for about an hour before Price stopped the car on the side of a rural road. Price and Daniels got out and pretended to urinate and asked Griffith to get out of the car. As soon as Griffith was out of the car, Price and Daniels both shot him, each firing at least two shots. Price shot Griffith with a .25 caliber Derringer that was never recovered, and Daniels shot Griffith with a .45 caliber Glock that was recovered and matched by ballistic evidence.

At trial, the medical examiner testified that Griffith died as a result of a combination of all of the shots. Martinez, Mosley, Price's girlfriend, and Griffith's best friend each gave testimony supporting the above-recited facts. There was evidence that Price paid certain individuals to supply him with a false alibi. There was also evidence that Price and Daniels had an extremely close relationship (likened to "twins") and that they often communicated without speaking. There was no direct evidence, however, that Price directed Daniels to shoot Griffith.[2]

## II.

 At the prayer conference, the State repeatedly requested an instruction on accomplice liability. Both of the prosecutors argued to the trial judge that the record evidence would support the requested jury instruction.[3] It is evident that despite substantial evidence that Price shot Griffith, the prosecutors were not content to rely on that theory of the case alone. They persistently insisted that the evidence also supported an accomplice liability theory as an alternative basis on which to convict Price of First Degree Murder. The trial judge considered seriously the arguments of both parties made over the course of two consecutive days, but ultimately expressed his belief that there was no evidence to support an accomplice liability theory. He, therefore, declined to give the State's requested instruction. We note the following instances, before his penultimate ruling, where the trial judge made it clear that he could find no evidence to support the requested instruction:

> The Court: I don't know how you get accomplice liability from there. Where is the factual basis to give it?[4]

> ———

> The Court: . . . How did Price in any way aid—How is Daniels the principal? There's no evidence that Daniels was the Principal actor here.[5]

> ———

> Mr. Apostolico: I understand You Honor's view of the evidence here. And that is consistent with the State's theory. But it appears to the State that—
> The Court: If you can point me to evidence, then you got—I have a much different situation. But the problem

---

2. The trial judge repeatedly found that there was no direct evidence that Price told Daniels to shoot Griffith. At one point, the trial judge said, ". . . there is no evidence that he [Price] directed him, not nary a witness that you can point to that Price directed Daniels. I don't know how you get around it." Trial Transcript at p. 88 (April 24, 2003).

3. James V. Apostolico and Natalie S. Woloshin were the Deputy Attorneys General of record for the State.

4. Prayer Conference Tr. at p. 3 (April 23, 2003).

5. *Id.* at p. 4.

here is I don't think you can. Because what I recited was basically your opening statement.

Mr. Apostolico: That is correct. State can't argue with that.

The Court: I'm not opposed to giving it, but I've got to have, in light of their objection —— even before their objection I started off with that look. Tell me where the evidence is.[6]

———

Mr. Apostolico: There's no direct evidence in the—where you have Price telling Daniels, I want you to finish him off.

The Court: That's the issue I have.[7]

———

Ms. Woloshin: That 18–page letter indicates that he orchestrated the drug deal and he told Mel, Jamel was to take Kenny so that Kenny would be the driver. He gave Jamel the money and told them specifically where to go and where it was. And I think he even writes in the letter, take Route 92, or whatever it is.

The Court: He also said, I didn't do it, didn't know anything about it. It was a beef between Mosley and—even from his statement I don't have anything which in any way shows that he aided, abetted, or did anything other than do a drug deal that didn't come off.

Mr. Apostolico: *Right, I think that's a fair statement.* (emphasis supplied)

The Court: So I don't have anything - [8]

———

Mr. Apostolico: We think the evidence supports the principal accomplice relationship.

The Court: What are the facts to support it other than Daniels was Mr. Price's alleged lieutenant? Generally speaking, you have no other evidence from anything other than Daniels said, Yeah; why don't you get out of the car; come on.[9]

———

The Court: But I mean the language says the jury can be instructed—before the jury can be instructed as to accomplice liability, there must be evidence that someone other than the defendant was the principal whom the defendant aided and abetted. And that is clearly not the case here... [10]

———

Ms. Woloshin: Consciousness of guilt. This was an earlier draft.

The Court: What you have is what I have here. And the consciousness of guilt I hadn't—what's your position on that?

Mr. Bernstein: Putting that in?

The Court: I don't know if they still want it.

Ms. Woloshin: We'd rather have accomplice liability.

The Court: I don't think there's a trade in the offing.

Mr. Apostolico: We don't have strong feelings about it. I think it is covered in the state of mind generally.

The Court: If you don't have any strong feelings, I'm not going to mess with it. Anything else you want to say on accomplice liability?

6. *Id.* at p. 10.

7. *Id.* at p. 13.

8. Prayer Conference Tr. at p. 14.

9. The day after the Prayer Conference, and before the parties' summations, final arguments were heard on the jury instructions. Trial Tr. at p. 10.

10. Trial Tr. at p. 16.

Mr. Apostolico: No, Your Honor. We made our position.

Mr. Bernstein: You know our position.

The Court: Does it help if I give it in the next case?

Ms. Woloshin: *You have to in that one.* (emphasis supplied)

Mr. Apostolico: We'll definitely argue for it in the next one.[11]

---

The Court: . . . All right. I'm not going to, as you might have suspected—I just don't see accomplice liability here. I just don't see it from the evidence. Not that I see the legal theory. And I do see the inference that could be drawn in some fashion. But it's just not the evidence to give in my estimation.

. . .

The Court: All Right. So the State has the exception as to the failure to give accomplice liability. Any other exception?

Ms. Woloshin: No.[12]

Immediately after the final conference on the instructions, Woloshin made the following statements during her summation:

. . . And at this point it's important for you to know that *in Delaware, if you direct another person to commit a crime, you who directed them are just as responsible as the person you directed.* . . . So it's pretty clear that, because of their relationship, that *Jamel Daniels knew what was going to happen and was directed by the defendant* to help him kill Kenny [Griffith] because of the debt that Kenny owed the defendant. *Therefore the defendant is responsible* for all of the injuries that Kenny suffered from the shots that Jamel Daniels fired. And those injuries were . . .

(Pause.) . . . And Dr. Pearlman testified that all of the injuries together caused Kenny's death; multiple gunshot wounds caused Kenny's death; although the most serious of those injuries are, first, the one to Kenny's abdomen, one the defendant caused when he shot Kenny with his Derringer; and the other one was to the back and shoulder area, which caused damage to the lungs and heart, which was caused by the bullet that *Jamel Daniels fired at the direction of the defendant.*[13] (emphasis added)

After Woloshin finished her summation, defense counsel objected, explaining that he did not object during her summation because he did not want to highlight her comments any more than necessary. The following exchange took place:

Mr. Bernstein: . . . We talked, I'm going to say, ad nauseam, about accomplice liability and the State's obvious desire to get an accomplice liability instruction, which the Court denied. And we agreed on causation, the language that the State proposed to the effect that more than one person can be responsible. But what was argued here was accomplice liability. He's responsible for something that somebody else did. I don't know how to unring that bell, Your Honor. I very strongly object. I am asking for a mistrial. It's just improper. They couldn't have been more on notice that it was taboo. They did it anyway. I just don't know what to say.

The Court: Ms. Woloshin.

Ms. Woloshin: Your Honor, I discussed this issue with Mr. Bernstein outside before I did this. And I told him exactly what I was going to say. I said I was

11. *Id.* at p. 42–43.

12. *Id.* at p. 44, 47.

13. *Id.* at p. 74–76 (emphasis added).

going to say to this jury that if they believed that the defendant directed either by word or deed Jamel Daniels, then he was responsible for what Daniels did. And *I did not imply that Daniels was the principal.* I simply said that, if the defendant directed, if they believed that the defendant directed Daniels to do this, then he's just as responsible. And this is directly in coming from—these are reasonable inferences from the evidence, in that the relationship between Jamel Daniels and Lou Price was so tight, it was an employee/employer relationship in some type of context other than say that if he believed—*if he directed him, then he's responsible.*

The Court: *But there is no evidence that he directed him,* not nary a witness that you can point to that Price directed Daniels. *I don't know how you get around it.* I looked up at the same breath 'cause I didn't quite understand it... And *you also said it's Delaware law. And I'm not instructing them in that fashion.* The charge I gave you guys doesn't say anything like that....*So how can you say it's Delaware law if I'm not going to instruct them on it?*... [14] (emphasis added)

At this point Woloshin begins to *reargue* the appropriateness of an accomplice liability instruction. In fact, she makes some of the same arguments that Apostolico had made unsuccessfully only hours earlier:

Ms. Woloshin: There was also—there was evidence about their relationship. There was also testimony about the fact that Jamel Daniels was the one who opened the door and got Kenny out of the car. There was also—or there's a reasonable inference that if there was not—some type of understanding between the two of them, the reasonable

inference is why did Jamel Daniels pull out his gun and start firing if there was no understanding between them? *Obviously, there had been some understanding -*

The Court: But there must be some evidence to support that. I mean, you can speculate on a lot of things that they may very well have said. Maybe I just misunderstood the point.

Ms. Woloshin: I think there was testimony about things that occurred. And the State can argue all reasonable inferences from the evidence. And there's a reasonable inference that if Jamel Daniels did nothing after the defendant fired his gun the reasonable inference is that they must have had some sort of understanding between them or else Jamel wouldn't have fired.

The Court: I don't know how you get to that point. But I've heard that portion. I really don't. But the question is, what do, if anything, we do? I don't think there is any evidence to support that. But *what do you respond to "that is Delaware law" where you have instructions and I have the instructions and there's no instruction that Price is responsible for what Daniels does?* Don't I have to instruct them as to the law?

Ms. Woloshin: Yes, Your Honor.

The Court: How do we get past that? Even if you can argue that what you did, you argued something—you've told them that Price is responsible for what Daniels does. So now what do I do—there's nothing in the instructions. And the only exception the State took was on the accomplice liability issue, so that's not the law. Again, how do we get around that?

14. Trial Tr. at p. 85–88.

Ms. Woloshin: If I could have a moment Your Honor.

(Pause.)

Ms. Woloshin: I think in that type of argument that I was making, as I was referring to the causation that we had instructed, that the Court had—that we had discussed earlier, under Delaware law, more than one person can be held responsible for causing the death of another. And if I misstated that, I apologize. But I think that the Court can—in order to cure that the Court can reread the causation instruction that you gave. And the Court can say I was wrong on how I phrased it. I mean, this is not evidence, obviously. The Court is the ultimate definer of the law. And the Court can say that. And the Court can say that I was wrong if I misstated the causation instruction.

Mr. Bernstein: ... To try and argue that, well, I made a mistake. I really meant to say causation, all she had to say was that more than one person can be responsible, which is exactly what we agreed to. She didn't begin to talk about causation then because that was at the tail end of the argument.

———

The Court: (after reading back the disputed comments by the prosecutor) *That's just not an accurate statement of the evidence. It's not close. It really isn't.* I mean that part isn't, where you say "it's pretty clear that Jamel Daniels knew what was going to happen and was directed by the defendant to help kill Kenny because of the debt." If you can point to me any witness that said that, that would take care of one situation, but I don't think you can. Interestingly enough, nobody even asked Mosley or Tito [Martinez]...was there any ex-

change between Daniels and Price relative to what happened after it happened? I don't think. And there was no testimony in that regard. So how do we get that? [15]

Ms. Woloshin: Do you want a response?

The Court: Yeah. I was being rhetorical.

Ms. Woloshin: ...I argued what I thought were reasonable inferences from the evidence in that there must have been some understanding between them because the defendant got out of the car and Jamel went and opened the car door. How would you know to let Kenny out of the car unless there was some understanding to get him out of the car?

The Court: The only testimony is they were going to Delaware to get the drugs from the defendant's house. That was the only testimony. And that was a ruse, that there was no indication that Daniels knew otherwise. There just isn't anything.

Ms. Woloshin: And I think I said there must be some understanding between the two of them because Daniels got Kenny out of the car... [16]

———

The Court: (after agreeing to a proposed curative instruction) I will add for the purposes of the record, whatever it's worth, I don't think you intentionally intended to circumvent or do anything wrong. I mean that. That and ten cents may get you a cup of coffee. I don't think you intended to do anything improper or incorrect. I guess that doesn't change much, but still.

Ms. Woloshin: I think that's a pretty accurate observation. There was abso-

**15.** Trial Tr. at p. 88–91 (emphasis added).

**16.** *Id.* at p. 96–98.

lutely no intention on my part to circumvent the Court's order or rules.

The Court: I honestly don't think there was.[17] (emphasis added)

### III.

We find the above related transcript excerpts astonishing. While we hesitate to take issue with the trial judge's gratuitous (and curious) comment· that he did not think Woloshin intended to circumvent his clear ruling rejecting accomplice liability, we note his palpable frustration and believe that his comments were, as he said, mere additions "for· the purposes of the record ..., whatever it's worth...." It is important, we think, to focus on the long, tedious battle the State waged to convince the trial judge to give an instruction on accomplice liability that would tell a jury, in essence, that "in Delaware, if you direct another person to commit a crime, you who directed them are just as responsible as the person you directed...."

The trial judge flatly, clearly and unambiguously rejected that requested instruction. As the trial judge saw the evidence: "...—even from his statement I don't have anything which in any way shows that he aided, abetted, or did anything other than do a drug deal that didn't come off ... there must be evidence that someone other than the defendant (Price) was the principal (Daniels) whom the defendant aided and abetted, *and that is clearly not the case here.*" To say that the prosecutors were on notice that the trial judge saw *no* evidence to support an accomplice liability charge would be an understatement. The trial judge *expressly stated* that he found "no evidence that he (Price) directed him (Daniels)." Nevertheless, Woloshin, present when those rulings were made on the record, stated in her closing that "in Delaware, if you direct another person to commit a crime, you who directed them are just as responsible as the person you directed.... Therefore, the defendant (Price) is responsible ... from (sic) the shots that Jamel Daniels fired."

We are mindful that the trial judge faced a dilemma. He was at the end of a long First Degree Murder trial about to go off track because of the prosecutor's conduct in her initial closing. The trial judge believed a curative instruction might save the case from error sufficiently substantive to otherwise warrant a mistrial. He may also have believed that a for-the-record comment that the prosecutor did not intend to circumvent his rulings could reinforce his justification for opting for a curative instruction rather than a mistrial to resolve any unfair prejudice. The trial judge may well have considered that in the future he would have to work with this prosecutorial team. The prosecutor, nonetheless, not only characterized the evidence in a way that the trial judge had found to be unsupported by the record but also urged the jury to convict on a legal theory on which he had adamantly refused to charge. However his efforts to salvage the trial may be viewed, we do not believe the record supports the trial judge's professed conclusion that the prosecutor did not intend to violate his earlier ruling denying her requested instruction on accomplice liability.

After thoroughly reviewing this record and carefully considering the prosecutor's remarks about her summation and her arguments opposing the motion for a mistrial, we can only conclude that she intentionally ignored the trial judge's clear finding that the evidence did not support a contention that Price "directed" Daniels to kill Griffith. Even before her summation, the

---

**17.** *Id.* at p. 103–104.

prosecutor made her disapproval of that ruling evident by a frustrated retort that the trial judge would "have to" give the accomplice liability instruction at Price's co-defendant, Daniel's trial.[18] The trial judge had ruled that the evidence did not support a jury instruction that Price could be held responsible if he had done no more than to direct Daniels to shoot the victim. Despite that ruling, Woloshin, nevertheless, informed the jury that "in Delaware" Price would be responsible if they determined that he "directed" Daniels to shoot Griffith. The prosecutor knew that the trial judge's instruction on the law of the case would present no such legal theory to the jury. Despite that, she unabashedly argued to the jury that the evidence supported such a finding. The trial judge's unequivocal ruling that the evidence did *not* support the theory and that his final instructions would not put the issue to the jury did not deter her from making certain that the jury would have an alternative theory on which to convict Price even if they did not believe that the evidence supported a finding that Price, himself, shot Griffith.

Woloshin's response to the defense's objection and to the Motion for a Mistrial dispels any uncertainty about her intentions before the jury.

■ First, she deflected responsibility for her actions by suggesting that Bernstein was also at fault because she "told him exactly what I[she] was going to say" and because Bernstein did not challenge her before she made her outlaw argument. It is not defense counsel's responsibility, however, to review a prosecutor's summation for compliance with the trial judge's rulings on proposed instructions, nor is there any suggestion that if he had so

cautioned her, that the caution would have caused her to rethink her position.

Second, during her initial response to the objection, Woloshin attempted to *reargue* the State's position on the sufficiency of the evidence to support her argument that Price directed Daniels to shoot Griffith, stating, "And this is directly in coming from—these are reasonable inferences from the evidence...." To that the trial judge responded, " But there is *no evidence that he directed him*, not nary a witness that you can point to that Price directed Daniels. I don't know how you get around it." (emphasis added) Undaunted and continuing to justify her blatant sidestep of the trial judge's ruling, Woloshin responded: "There was also—or there's a reasonable inference that if there was not—some type of understanding between the two of them. *Obviously, there had been some understanding.*"

Finally, after pausing to realize that reargument at this stage of the proceedings was both improper and futile, she took a different tack. Disingenuously, we believe, Woloshin insisted that her objectionable argument was simply "referring to the causation that we had instructed." Causation, however, only related to the fact that when two people shoot another at the same time and the multiple shots indistinguishably cause death, a jury can find both persons responsible. "Causation" had absolutely nothing to do with whether Price "directed" Daniels to shoot Griffith and Woloshin knew that both at the time of her closing argument *and* at the time she argued against the defense's Motion for a Mistrial.

The record supports only one conclusion: Woloshin's refusal to accept the trial

---

**18.** A retort to which Apostolico, her co-counsel, promptly and tactfully responded: "We'll definitely *argue* for it in the next one."

judge's clear ruling on an issue that she remained determined to argue to the jury caused her to embark on an inappropriate legal frolic of her own. Her actions reflect no concern about complying with an adverse ruling from the bench.

The issue here is not whether the trial judge erred by refusing to give an accomplice liability charge where inferences from the evidence supported it. The issue is whether the prosecutor's refusal to abide by the ruling and her inappropriate remarks to the jury unfairly prejudiced Price in a way that jeopardized Price's right to a fair trial.

## IV.

■ We review a claim of prosecutorial misconduct *de novo* to determine whether the conduct was improper or prejudicial.[19] There can be no question that a prosecutor's blatant refusal to abide by a critical ruling by a trial judge on the law constitutes misconduct. Therefore, the issue becomes whether that misconduct warrants reversal of the conviction.[20] In *Hughes v. State,* this Court adopted a three-part test to evaluate prosecutorial misconduct: "the closeness of the case, the centrality of the issue affected by the (alleged) error, and the steps taken to mitigate the effects of the error."[21] *Hunter v. State*[22] also demands that we review the misconduct itself to determine if it is part of a pattern of prosecutorial misconduct; the repetition of which "adversely affects the integrity of the judicial process," and may warrant reversal.[23]

The corroborative physical evidence and testimony of numerous witnesses convinces us that this is not a close case. There were two eyewitnesses to the actual shooting, each of whom testified consistently with the other. There was also evidence of an attempt by Price to "buy" an alibi defense, which demonstrated his awareness of guilt.

The next factor is the centrality of the issue. The medical examiner testified that Griffith died as a result of the combined effect of all of the gunshot wounds. Therefore, the jury would not have to find that Price directed Daniels to shoot Griffith in order to convict, even if the evidence supported such a theory. The jury would only need to find that Price shot Griffith, since Griffith died as a result of the combined shots fired by Daniels and Price.

■ Finally, the trial judge gave a clear curative instruction on the law and told the jury specifically that Price could not be held responsible for Daniels' actions:

> Further, I instruct you as a matter of law that you may not hold Mr. Price responsible for the actions of Mr. Daniels. You may only consider the evidence in the record as to Mr. Price's activities in determining whether he is guilty or not guilty as charged and may not impute anything done by Mr. Daniels to Mr. Price in that regard. Do you understand?[24]

This instruction sufficiently mitigated any unfair prejudice to Price because it took from the jury the issue unfairly put to it by Woloshin, and made it clear that the

**19.** *Hunter v. State,* 815 A.2d 730 (Del.2002).

**20.** *Id.* at 737.

**21.** 437 A.2d 559, 571 (Del.1981) (quoting *Dyson v. United States,* 418 A.2d 127, 132 (D.C. 1980)).

**22.** Note 19, *supra.*

**23.** *Hunter,* 815 A.2d at 737–738; *Brokenbrough v. State,* 522 A.2d 851, 864 (Del.1987).

**24.** Trial Tr. at p. 105.

jurors were to focus on Price's actions regardless of what Daniels may have done. A jury is presumed to follow the instructions given by the court notwithstanding a prosecutor's outlaw argument.[25] Accordingly, all three of the *Hughes* factors weigh heavily in favor of a conclusion that the prosecutor's misconduct did not result in unfair prejudice that adversely affected the outcome of the case.

We conclude that the prosecutor's conduct, although inexcusable and regrettable, did not so compromise the integrity of the judicial process that Price did not receive a fair trial. Accordingly, the conviction must be affirmed.

## V.

■ In *Hunter*, we lamented that at least five instances of prosecutorial misconduct were found during 2002 that resulted in three reversals of convictions.[26] We also cited a litany of cases that expressed "considerable concern" about a general failure to improve prosecutorial standards of trial conduct.[27] Once again: "For over twenty years, this Court has been admonishing prosecutors to follow ABA Standards of Conduct and refrain from making improper comments during summation that could prejudice the defendant."[28] A prosecutor "represents all the people, including the defendant"[29] and must "seek justice, not merely convictions."[30] Further, the American Bar Association's standards governing prosecution, condemn: (i) the expression of personal beliefs as to the credibility of witnesses;[31] (ii) the misrepresentation of trial evidence;[32] (iii) commenting on the fact that a defendant exercised his or her constitutional right to remain silent;[33] (iv) denigrating the role of defense counsel;[34] (v) misrepresenting the legal effect of defendant's statements;[35] (vi) an appeal to the jury's sense of personal risk or the level of safety in the community;[36] or (vii) an attempt to inflame the prejudices of the jury by name-calling or other pejorative language.[37]

At first glance, and consistent with *Hunter*, this appears to be an issue that we would review on a "clean slate" because this Court has not seen this specific kind of

**25.** *Brown v. State,* No. 528, 2000, 2001 Del. Lexis 325, at *3 (Del.2001) (juries are presumed to understand and follow instructions issued by the Superior Court); *Pena v. State,* No. 555, 2003, 856 A.2d 548 (2004).

**26.** 815 A.2d at 731 citing *Walker v. State,* 790 A.2d 1214 (Del.2002); *Morris v. State,* 795 A.2d 653 (Del.2002); *Williams v. State,* 796 A.2d 1281 (Del.2002); *Williams v. State,* 803 A.2d 927 (Del.2002).

**27.** *Brokenbrough,* 522 A.2d at 854.

**28.** *Williams,* 803 A.2d at 928.

**29.** *Bennett v. State,* 164 A.2d 442, 446 (Del. 1960).

**30.** *Sexton v. State,* 397 A.2d 540, 544 (Del. 1979). See also *State v. Torres,* 328 N.J.Super. 77, 744 A.2d 699, 708 (App.Div.2000) "A prosecutor is not simply another lawyer who happens to represent the State. Because of the overwhelming power vested in his office, his obligation to play fair is every bit as compelling as his responsibility to protect the public."

**31.** *Clayton v. State,* 765 A.2d 940, 942 (Del. 2001).

**32.** *Morris,* 795 A.2d at 659.

**33.** *Bowe v. State,* 514 A.2d 408, 410 (Del. 1986).

**34.** *Walker,* 790 A.2d at 1219.

**35.** *Warren v. State,* 774 A.2d 246, 255 (Del. 2001).

**36.** *Williamson v. State,* 707 A.2d 767 (Table), 1998 WL 138697 (Del.Supr.).

**37.** *Brokenbrough,* 522 A.2d at 860–61.

prosecutorial misconduct in past decisions.[38] However, while this particular instance of misconduct may enjoy "clean slate" status, this particular prosecutor does not. We note for the purposes of this decision that the same prosecutor who committed misconduct here was also at the center of a recent appeal highlighting her serious failures to comply with the rules of discovery in a drug case.[39] In an extraordinary, and likely telling, turn of events, the Attorney General, herself, reviewed, and then abandoned, the State's argument on appeal defending this prosecutor's conduct in that case.[40] We are obligated to express our concern that prosecutorial misconduct leading to reversal of an otherwise error free conviction includes not only "repetition of the same type or category of errors," but also a persistent pattern of misconduct by a single prosecutor whose actions cannot be fairly attributed to human error or honest mistake and compels equally strict scrutiny.

Departure from these ethical and professional obligations *should* be remedied other than by reversing convictions as a means to punish "a blundering ... prosecutor."[41] Where (as here) we can fairly conclude the unfair prejudice caused by such a prosecutor did not adversely affect the outcome of a trial and did not reflect a pattern of conduct that compromises the integrity of the judicial process, we must find other ways to address the prosecutor's misconduct.

■ A prosecutor is simultaneously both an officer of this Court and an officer of this State; the direct report of a duly elected Attorney General. Besides performing the role of chief law enforcement officer of the State, the Attorney General also supervises prosecutors with a view to obtaining effective and uniform enforcement of the criminal laws.[42] Thus, so as the public looks to the Attorney General when law enforcement runs amok, so do we when prosecutorial conduct does the same. The misconduct in this case was not a mere moment of incompetence, nor a matter of inexperience. At best, it was outright indifference to a trial judge's ruling. At worst, the prosecutor acted with intent to prejudice the defendant's right to a fair trial. What is not arguable is that the prosecutor acted in a manner wholly at odds with her overriding duty as a prosecutor and as an officer of the court, to seek justice. The Attorney General has an appropriate statutory mechanism at her disposal to address this situation.[43] Accord-

38. 815 A.2d at 738 citing *Coyle v. State*, 618 A.2d 90 (Table) (Del.1992).

39. See *Padilla v. State*, 852 A.2d 908 (Table), 2004 WL 368941 (Del.Supr.).

40. The Attorney General, after personally reviewing the briefs and the transcript of the oral argument made by the offending prosecutor before this Court, determined that, in light of the particular errors made by the prosecutor, a *nolle prosequi* should have been entered after the first mistrial—and requested that we remand for that purpose.

41. *Torres*, 744 A.2d at 708. "The purpose of our system of criminal justice is to protect the innocent and punish the guilty. When a criminal trial is barred without reference to the evidence and a potential criminal is set free, the pain of such preclusion is felt, not by the inanimate State, or by some penitent assistant prosecutor, but by the offender's next victim. In such a way, the innocent are denied the protection due them by our Constitution."

42. See generally *29 Del. C. § 2502 et seq.*

43. *29 Del. C. § 2511.* Tenure. Any attorney or other employee regularly employed by the Department of Justice to render services shall be appointed by the Attorney General to serve at the Attorney General's pleasure. After 3 years full-time service the employee shall have attained tenure and shall continue to be regularly employed during efficient and good

ingly, we refer this matter to the Attorney General to afford her an opportunity to take measures she deems appropriate.

The judgment of the Superior Court is AFFIRMED.

behavior and shall not be removed because of religious or political opinions or affiliations or except for due cause, after a hearing before a court consisting of 3 judges of the Superior Court of the State.